# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ) | MBD NO. 20-MC-91138 |
| Applicant, ) | |
| v. ) | |
| CHARTER COMMUNICATIONS, INC., ) | |
| Respondent. ) | |

**DECLARATION OF FENG ("KENNETH") AN,
EEOC BOSTON AREA OFFICE DIRECTOR**

I, Feng ("Kenneth") An, declare under penalty of perjury that the following is true and correct:

1.      I am the Area Director of the Boston Area Office of the United States Equal Employment Opportunity Commission ("EEOC"), and, in that role, I am responsible for the operations of the office, including investigations undertaken by staff in the office.

2.      The Boston Area Office is responsible for investigating charges that employers have engaged in employment practices made unlawful by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII").

3.      Among the EEOC's investigative files in the Boston Area Office is the charge file for Charge No. 523-2018-00971 ("Charge") filed against Charter Communications, Inc. ("Respondent") by Charging Party, Samantha Fenderson ("Charging Party").

4.      I state the following based upon my personal examination of the file for Charge No. 523-2018-00971:

a. On April 2, 2018, the Boston Area Office received a written complaint of
   discrimination from Charging Party alleging that she was discriminated against on
   the basis of sex/pregnancy, in violation of Title VII, by Respondent. (A copy of
   this complaint is attached hereto as Exhibit A).[1]

b. On December 12, 2018, EEOC served Respondent with a Notice of Charge
   identifying Samantha Fenderson as the Charging Party and indicating that she had
   filed a charge of sex discrimination against Respondent. (A copy of the Notice of
   Charge is attached hereto as Exhibit B.).

c. On February 1, 2019, Charging Party perfected her charge by signing and
   verifying a Charge of Discrimination alleging sex discrimination (pregnancy) and
   retaliation in violation of Title VII. (A copy of the Charge of Discrimination is
   attached hereto as Exhibit C). The Charge of Discrimination was served on
   Respondent.

d. On July 1, 2019, EEOC served a written Request for Information on Respondent.
   The request sought all documents relating to Charging Party's request for an
   accommodation to her pregnancy (including Charging Party's request for a new
   uniform, light duty, job modification, or other reasonable accommodation) as well
   as a list of employees in New England who, at any time since September 1, 2016,
   had sought a reasonable accommodation for a disability and a list of all
   employees in New England who, during that same time period, had requested a
   reasonable accommodation for a condition related to pregnancy or childbirth. (A

---

[1] This document has been redacted because it references a charge of discrimination filed by a charging party other than Ms. Fenderson. Title VII prohibits public disclosure of this information. 42 U.S.C. § 2000e-5(b). Respondent has been provided with the un-redacted version of this document.

copy of the Request for Information is attached hereto <u>Exhibit D</u>).[2]  Charter failed

to respond to this request.

e.   On August 9, 2019, EEOC again asked Respondent to respond to the July 1, 2019

Request for Information.  Respondent requested an extension, until August 16,

2019, to respond, and EEOC agreed.

f.   On August 16, 2019, Charter responded to EEOC's Request for Information.  In

response to EEOC's request for documents relating to Charging Party's request

for an accommodation, Respondent produced documents concerning

communications between Charging Party and Sedgwick, Respondent's agent;

communications between Charging Party's doctor and Sedgwick; and

communications from Sedgwick to Respondent.  Respondent provided no

documents relating to communications between it and Sedgwick, nor did it

provide any documents reflecting the company's consideration of Charging

Party's requests.  Respondent objected to EEOC's request for comparator

information.  Respondent complained that the request was "overly broad; unduly

burdensome; not properly limited in temporal, geographic, or subject matter

scope; not proportional to the needs of the case; not relevant to Charging Party's

claims; and seeking confidential medical information from individuals who are

not parties to this Charge and who have not consented to the disclosure of such

information."  (A copy of Respondent's August 16, 2019 response is attached

hereto as <u>Exhibit E</u>).[3]

---

[2]    This document has been redacted for the same reasons described in footnote 1, above.
[3]    This document has been redacted for the same reasons described in footnote 1, above.

g.  On September 11, 2019, after reviewing the information Respondent produced, EEOC gave Respondent a second opportunity to voluntarily provide information about Respondent's consideration of Charging Party's request for accommodation and comparator data.  On September 26, 2019, Respondent informed EEOC that it was maintaining its objections to providing comparator information and declined to provide additional information relating to Charging Party's request for accommodation.

h.  On October 28, 2019, EEOC served Respondent with a second written Request for Information.  At that time, EEOC informed Respondent that the documents it had previously supplied "indicate that Charging Party initially requested an accommodation to a lifting restriction and restriction on heights."  EEOC asked Respondent to provide copies of all documents concerning Respondent's receipt and evaluation of that request and to identify the individual(s) employed by Respondent who decided to deny that request.  EEOC narrowed its request for comparator information to all Field Technicians working in New England who, at any time since September 1, 2016 requested a reasonable accommodation to a disability or an accommodation to pregnancy or a condition related to pregnancy/childbirth.  EEOC again sought contact information for these individuals.  (A copy of the October 28, 2019 Request for Information is attached hereto as Exhibit F).

i.  On November 15, 2019, Charter provided a response to EEOC's second Request for Information.  Respondent objected to providing any comparator information, again complaining that EEOC's request was "overly broad; unduly burdensome;

4

not properly limited in temporal, geographic, or subject matter scope; not proportional to the needs of the case; not relevant to Charging Party's claims; and seeking confidential medical information from individuals who are not parties to this Charge and who have not consented to the disclosure of such information." Respondent denied that Charging Party had requested a lifting or height restriction or that it had denied such a request.  (A copy of Respondent's November 15, 2019 Letter is attached hereto as <u>Exhibit G</u>).

j.  On December 12, 2019, EEOC sent Respondent an email clarifying that its October 28, 2019 Request for Information sought communications between Respondent and Sedgwick as well as information about uniforms available to Respondent's employees through a third-party supplier.  (A copy of this email is attached hereto as <u>Exhibit H</u>).

k.  On December 13, 2019, Respondent sent EEOC a letter.  With regard to EEOC's request for documents relating to communications between Respondent and Sedgwick, Respondent referred EEOC to documents it had already produced. Respondent further stated that its December 13, 2019 letter "will serve as Charter's final response to the Commission's request for additional information." (A copy of this letter is attached hereto as <u>Exhibit I</u>)

l.  On December 19, 2019, as part of its continued efforts to investigate the Charge of Discrimination, EEOC issued Subpoena No. NY-A20-006, returnable on January 9, 2020, and served the Subpoena on Respondent by certified mail.  (A copy of the Subpoena is attached hereto as <u>Exhibit J</u>).

m.  Respondent received Subpoena No. NY-A20-006 on January 2, 2020.  (A copy of the certified mail receipt is attached hereto as Exhibit K.).

5.  As of the date of this Declaration, Respondent has failed to provide the EEOC with the information requested in Subpoena No. NY-A20-006.

6.  On January 9, 2020, Respondent filed a Petition to Revoke Subpoena No. NY-A20-006. (A copy of Respondent's Petition is attached hereto as Exhibit L).

7.  On February 6, 2020, the Commission issued a Determination denying Respondent's Petition to Revoke and providing Respondent ten (10) days to produce the documents described in Subpoena No. NY-A20-006.  (A copy of the Commission's Determination is attached hereto as Exhibit M).

Date: March 13, 2020

Feng An

Digitally signed by Feng An
DN: cn=Feng An, o=United States Equal
Employment Opportunity Commission,
ou=Boston Area Office,
email=Feng.An@EEOC.GOV, c=US
Date: 2020.03.13 12:54:47 -04'00'

Feng "Kenneth" An
Area Director
Boston Area Office

6

# EXHIBIT A

RECEIVED
APR 0 2 2018
U.S. E.E.O.C
Boston Area Office

This document is my complaint against Charter Communications.

There are a few things that should be known to understand the full scope of this complaint. I worked for Charter Communications as a field technician. My then boyfriend and now husband (Joseph Fenderson) worked together on the same team of about ten technicians. We have both had exceptional monthly and yearly reviews with zero "write ups" or any disciplinary action ever during our careers. We both worked on the same days and the same shift which allowed us to 'pick up' each other's assigned jobs if one of us was falling behind.

Joseph was the lead technician for our team at the time we started dating and effectively my boss. This was made known to Charter/TWC immediately as required by the companies' policy on nepotism. The company made the choice based on "business need" to not reassign one of us to a different team. They told Joseph that he was no longer authorized to perform "safety checks" on me and he was no longer authorized to address any customer complaints with regard to me.

[REDACTED] One of those documents is a letter that was written to Harth Gullett (Sr. HR Director) by Joseph that outlines our struggle.

Below I have listed the issues that have lead me to this complaint of discrimination:

I informed Charter/TWC the day that I found out that I was pregnant because my job is very physical with ladders and climbing gear and because of that, I knew that a point would come when I would be unable to safely preform my duties. I wanted to be sure that a plan was in place for that eventuality, so I tried to be as upfront as possible to facilitate a seamless transition from working to disability for the duration of my pregnancy. The first thing that my supervisor (Jen Gorgone) told me was "short term disability is for people with real disabilities, you will be off without pay. It's not our fault that you got pregnant".

I have known Jen for a while and what I have found is that it is important to verify her facts because many times they are less then accurate, so I asked our local human resource director (Dian Thornton) if what Jen had told me was true. Diane scheduled a meeting with Joseph and myself to talk about our options. During this meeting, Diane informed us that she has not yet had to make accommodations for a pregnant technician because there haven't been any during her career. Joseph suggested that she ask her counterparts across the country how they have handled similar situations. She refused to do this, and we heard nothing from Diane until a couple months later when we inquired as to a progress report on what the plan might be and how all this works. Diane not only did not have an answer or any guidance, but she needed to be reminded again what the issue was about because she had forgotten what we were talking about. Because Diane could not be bothered with this issue the result was that I did not go out on leave until I was 5 months pregnant. This was very unsafe because of extreme morning sickness and because of the fact that I was sleeping in customers driveways. I was later informed by Charters internal investigator that I could have went out on paid leave much sooner and if Diane would have told me that when I asked her then I would have gone out sooner.

I went out on leave in mid-February and returned to work on August 15th. On the day of my return, I informed my supervisor (Jen Gorgone) that I was breastfeeding my daughter and that I would need to pump a few times that day, however I left my breast pump at home. I asked her if somebody in my area could swing by my house to pick it up or could I leave to go retrieve my pump? Jen's reply to me was " I don't want to hear about your boobs, we have work to do".

I told her at about noon that my breasts were starting to hurt and that a little bit of milk was leaking through my shirt. Her reply was "Maybe you can go home early". She allowed me to leave at 3:30pm and at that time my breasts were swollen, hurt, leaking and my shirt was completely drenched. I had nothing to cover myself with so I had to walkaround like that until I left for the day. This incident led to an extremely painful infection in my breasts. The other thing that this incident brought with it was damage to my milk producing capability. Milk production became very low and it could not be recovered so, as a result, I had to start supplementing formula to feed my daughter with the hope that my production would recover but it never did and the following actions taken by Charter Communication certainly did not help the situation and very likely aggravated the injury.

After that day my work was back to normal in that I was working in my area out in the field servicing our customers. At first and because of Jen's obstinance toward my need to express my milk, I was very apprehensive to bring it up again so this made me pump only one time a day during work if that was even possible and I usually did this by going home on my lunch break or just pulling over on the side of the road and doing it in my truck which has led to instances of people walking up on me to ask for phone numbers, remotes or just to inquire if I was okay. Needless to say, these were very embarrassing situations for me.

My husband saw all of this and began sending emails to our HR department to demand that the law be followed. He sent copies of the law to the HR department. He called the regional HR director Harth to get him involved and to be sure that he was in the loop. All of this fell on deaf ears until he sent the E-mail entitled "Letter to Harth" (included with this complaint) that the issue was escalated to the internal investigations department.

Even with an ongoing investigation, the company was relentless in opposition to my pumping. In the beginning of this complaint I mentioned that Joseph Fenderson and myself would help each other out so that one of us could have time to do other things. This was Charters next try to limit my ability to pump however this one included the added benefit to Charter of preventing me or my husband from picking up my daughter from daycare at the end of our shifts so I have time to stop between jobs to pump. They instituted a policy that only applied to Joseph Fenderson and myself. Jen told us that we are no longer aloud to talk to each other about anything work related nor are you aloud to take work from one another and she furthermore stated that this has been the policy all along. Jen said to me "we work until were done and if you can't comply with that then you should look for a new job".

First, they denied my ability to pump and pick up my daughter and then they went further and blocked the solutions that I came up with on my own.

There were several emails that went back and forth from the local HR department where Heidi specifically states that "Charter is not required to allow me to pump because it would be a hardship on the company".

Following this exchange, I fought for a meeting with HR and my supervisor so that we can come up with a plan. This meeting was pushed for 2 days and only happened after I got the Maine department of labor involved. The attendees at the meeting consisted of myself, Jen Gorgone and Diane Thornton. They offered a solution that I pump in my truck when time permitted and that if I could find something to drape over me that was not too expensive then maybe the company would buy the item. They went on to say that they would limit my jobs to six a day and not give me any "no contact" jobs (sro).

To this I said that our jobs take 1.5 hours so, 6 jobs would take 9 hours and that's not including travel time, breaks, lunch or pumping. To add to this, on the very day that this "agreement" was reached, it was violated because they did not provide time to pump, I had 2 "no contact" jobs and I did not get a lunch. When I told of HR director Diane that I was not going to have time for lunch or pump she replied, "What do u want me to do about it?" This was literally at the end of the meeting that we had that guaranteed these things to me.

More emails were exchanged, and my family was moving to a different town. I have an email from Heidi stating that I can work in this new town so that I can pump as a possible solution but when it came time for that the offer had changed to something designed to make my life harder. Diane claimed that due to business need, my pumping could not be accommodated in that way and now I was to drive over an hour each morning to work in Portland and I could come back to the office in Portland at 10, 12 and 2 for pumping. This was not going to work as it created new challenges. First, they refuse to control the jobs that I get so for example: This would be my day had this solution been excepted. I would wake up at 5 to pump then leave my house at 6 in my personal car to take my daughter to daycare and return home to pick up my work truck by 6:45. Then I would drive to Portland and arrive at 8 and at that time I need to pump because it has been 3 hours since the last time. After pumping I would leave the office by 8:45 to travel to my first job. After I arrive and do the job it would be 11 then I travel back to the office to pump by 12 because by the nature of the plan, I could never make it back by ten. Then go have lunch and so on. Its easy to see how this wouldn't work with 6 jobs. And now I would be working in Portland, the largest city in Maine so there will be no chance to pump on the side of the road because of all the people everywhere as if that was ever an acceptable option. When I mentioned this to Diane Thornton she replied "hmmmm.. that's the offer".

I went to EEOC website at the beginning of all this to find what other telecommunications workers did to solve their issues with regard to time and place for pumping. I found that if they work in their area then they just go home as needed for pumping. I asked for this early on and again when I was presented with this offer. The request was denied both times as Charter said that it would be a hardship.

I gave my two weeks' notice because Charter was not acting in good faith with regard to my pumping and when they made a "plan" they refused to stick to it. Harth from our regional HR department called me about a week later to offer me what I was requesting from day 1. I loved my job, so I took the weekend to think about it before rejecting the offer for the same reasons stated above. It has gone on far to long, damage has been done to me and my family. (BTW for my husband's efforts on my behave he was written up for the first time ever with no explanation in a secret meeting that he was not aloud to know about until the meeting began.) As well as the fact that Charter has shown with empirical evidence, each and every time that they are incapable of following through on what they say they will do.

-Samantha Fenderson

RECEIVED
APR 0 ? 2018
U.S. E.E.O.C
Boston Area Office

# EXHIBIT B

EEOC FORM 131 (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| **CHARTER COMMUNICATIONS**<br>118 Johnson Rd<br>Portland, ME 04102 | **Samantha Fenderson** |
| | THIS PERSON (check one or both) |
| | ☐ Claims To Be Aggrieved |
| | ☐ Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**523-2018-00971** |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII)    ☐ The Equal Pay Act (EPA)    ☐ The Americans with Disabilities Act (ADA)

☐ The Age Discrimination in Employment Act (ADEA)    ☐ The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [X] No action is required by you at this time.

2. ☐ Please call the EEOC Representative listed below concerning the further handling of this charge.

3. ☐ Please provide by  a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

4. ☐ Please respond fully by  to the enclosed request for information and send your response to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

5. ☐ EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources.  If you would like to participate, please say so on the enclosed form and respond by
to
If you **DO NOT** wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above.  Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| **Adriana Gomez,**<br>**Investigator**<br><br>*EEOC Representative*<br><br>*Telephone*   **(617) 565-3203** | **Boston Area Office**<br>**John F. Kennedy Fed Bldg**<br>**Government Ctr, Room 475**<br>**Boston, MA 02203**<br>**Fax: (617) 565-3196** |
|---|---|

Enclosure(s):   ☐ Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

☐ Race    ☐ Color    [X] Sex    ☐ Religion    ☐ National Origin    ☐ Age    ☐ Disability    [X] Retaliation    ☐ Genetic Information    ☐ Other

ISSUES: Maternity, Accommodation, Terms/Conditions, Retaliation

DATE(S) (on or about):  LATEST: 02-18-2018

| Date<br><br>**December 12, 2018** | Name / Title of Authorized Official<br><br>**Feng K. An,**<br>**Area Office Director** | Signature |
|---|---|---|

*Enclosure with EEOC*
*Form 131 (11/09)*

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA.  These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge.  (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below).  Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14   Preservation of records made or kept.**  . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action.  The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected.  The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 207(f) of GINA, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes.  The Equal Pay Act contains similar provisions.  Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made.  Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you.  If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

# EXHIBIT C

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 523-2018-00971 |

| Maine Human Rights Commission | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)*<br>**Mrs. Samantha Fenderson** | Home Phone *(Incl. Area Code)*<br>**(207) 636-6773** | Date of Birth |
|---|---|---|

Street Address<br>**37 Kennedy Dr., North, ME 04061**          City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>**Charter Communications** | No. Employees, Members<br>**15 +** | Phone No. *(Include Area Code)*<br>**(207) 253-2222** |
|---|---|---|

Street Address<br>**118 Johnson Rd., Portland, ME 04102**          City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest          Latest **2/18/2018**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I worked for Respondent from April of 2015 to approximately February 18, 2018, and my last position was Field Technician III.

In or around September of 2016, I informed Jennifer Goreone, Supervisor, about my being pregnant. I also inquired about short-term disability leave. However, Respondent met the notice of my pregnancy and inquiry for disability leave with hostility—beginning with Ms. Goreone who said to me, "Short-term disability is for real people who have real disabilities. It's not our fault you got pregnant."

In or around September of 2016, my husband, Joseph Fenderson, an employee of Respondent, and I, engaged in protected activity. In efforts to assert my rights and Respondent's failure to accommodate me, we sent the Pregnancy Act information to Diane Thorton, Human Resources; Heidi Leguit, Human Resources; Harv Guilet, Head of Human Resources; and Jennifer Goreone, Supervisor.

In or around December of 2016, Respondent refused to accommodate me with work pants that fit me during my pregnancy. Yet, I was required to continue to wear the work uniform. I was forced to make due with the work pants that did not fit me. I placed a rubber band on the button of my pants to attempt to hold them in place. Sometimes, the shirt would come up. I would apologize to the customers and say, I am so sorry, my

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Date 2/1/1?          x *[signature]*<br>*Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 523-2018-00971 |

| **Maine Human Rights Commission** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

pants do not fit anymore. It was extremely humiliating.

In or around March of 2017, I submitted doctor's notes and again requested a reasonable accommodation. It had become a health and dangerous safety hazard for me to continue to perform my job duties without an accommodation. Respondent refused to provide me with an accommodation.

From on or about March 4, 2017, to August 13, 2017, I stopped attending work. During this period, I was informed by Segewick, a third-party entity, that I was denied accommodations by Respondent and should go back to work. Segewick further advised that if anything happens to me, that I should then sue Charter Communications.

On August 14, 2017, I returned to work and Respondent officials met me with continued hostility. Prior to my return to work, I requested from Human Resources an accommodation to be able to pump breast milk. Human Resources refused to address the issue. As a result, when I returned to work, at times, I suffered extreme breast pain due to the inability to pump for more than 10 hours. On an occasion, where I was under great pain due to not pumping, I attempted to explain my need to take leave to Supervisor Goreone, who responded by saying—I do not want to hear about your "boobs." I was not permitted to take leave until we completed the shuffling of cars on that occasion. I believe that other similarly situated employees not in my protected class, are subjected to more favorable terms and conditions of employment.

On or about February 1, 2018, I submitted my resignation. Effective February 18, 2018, I was constructively discharged by Respondent's discriminatory and retaliatory acts.

I believe I have been discriminated against based upon my sex (female/pregnancy), and retaliated against for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended and under applicable state laws.

SEE ATTACHED STATEMENT FOR ADDITIONAL DETAILS.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 2/1/1<br>*Date*      X _____<br>*Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

RECEIVED
APR 0 2 2018
U.S. E.E.O.C
Boston Area Office

This document is my complaint against Charter Communications.

There are a few things that should be known to understand the full scope of this complaint. I worked for Charter Communications as a field technician. My then boyfriend and now husband (Joseph Fenderson) worked together on the same team of about ten technicians. We have both had exceptional monthly and yearly reviews with zero "write ups" or any disciplinary action ever during our careers. We both worked on the same days and the same shift which allowed us to 'pick up' each other's assigned jobs if one of us was falling behind.

Joseph was the lead technician for our team at the time we started dating and effectively my boss. This was made known to Charter/TWC immediately as required by the companies' policy on nepotism. The company made the choice based on "business need" to not reassign one of us to a different team. They told Joseph that he was no longer authorized to perform "safety checks" on me and he was no longer authorized to address any customer complaints with regard to me.

Joseph also has a claim with the EEOC with an inquiry number of 523-2018-00399 based on the retaliation for advocating for my and our daughter's rights. These claims are very much connected however due to the unavailability of the new scheduling system, his phone interview will not be until June 6th. I have included his claim as an attachment as well as a couple supporting documents of my own. One of those documents is a letter that was written to Harth Gullett (Sr. HR Director) by Joseph that outlines our struggle.

Below I have listed the issues that have lead me to this complaint of discrimination:

I informed Charter/TWC the day that I found out that I was pregnant because my job is very physical with ladders and climbing gear and because of that, I knew that a point would come when I would be unable to safely preform my duties. I wanted to be sure that a plan was in place for that eventuality, so I tried to be as upfront as possible to facilitate a seamless transition from working to disability for the duration of my pregnancy. The first thing that my supervisor (Jen Gorgone) told me was "short term disability is for people with real disabilities, you will be off without pay. It's not our fault that you got pregnant".

I have known Jen for a while and what I have found is that it is important to verify her facts because many times they are less then accurate, so I asked our local human resource director (Dian Thornton) if what Jen had told me was true. Diane scheduled a meeting with Joseph and myself to talk about our options. During this meeting, Diane informed us that she has not yet had to make accommodations for a pregnant technician because there haven't been any during her career. Joseph suggested that she ask her counterparts across the country how they have handled similar situations. She refused to do this, and we heard nothing from Diane until a couple months later when we inquired as to a progress report on what the plan might be and how all this works. Diane not only did not have an answer or any guidance, but she needed to be reminded again what the issue was about because she had forgotten what we were talking about. Because Diane could not be bothered with this issue the result was that I did not go out on leave until I was 5 months pregnant. This was very unsafe because of extreme morning sickness and because of the fact that I was sleeping in customers driveways. I was later informed by Charters internal investigator that I could have went out on paid leave much sooner and if Diane would have told me that when I asked her then I would have gone out sooner.

I went out on leave in mid-February and returned to work on August 15th. On the day of my return, I informed my supervisor (Jen Gorgone) that I was breastfeeding my daughter and that I would need to pump a few times that day, however I left my breast pump at home. I asked her if somebody in my area could swing by my house to pick it up or could I leave to go retrieve my pump? Jen's reply to me was " I don't want to hear about your boobs, we have work to do".

I told her at about noon that my breasts were starting to hurt and that a little bit of milk was leaking through my shirt. Her reply was "Maybe you can go home early". She allowed me to leave at 3:30pm and at that time my breasts were swollen, hurt, leaking and my shirt was completely drenched. I had nothing to cover myself with so I had to walkaround with that until I left for the day. This incident led to an extremely painful infection in my breasts. The other thing that this incident brought with it was damage to my milk producing capability. Milk production became very low and it could not be recovered so, as a result, I had to start supplementing formula to feed my daughter with the hope that my production would recover but it never did and the following actions taken by Charter Communication certainly did not help the situation and very likely aggravated the injury.

After that day my work was back to normal in that I was working in my area out in the field servicing our customers. At first and because of Jen's obstinance toward my need to express my milk, I was very apprehensive to bring it up again so this made me pump only one time a day during work if that was even possible and I usually did this by going home on my lunch break or just pulling over on the side of the road and doing it in my truck which has led to instances of people walking up on me to ask for phone numbers, remotes or just to inquire if I was okay. Needless to say, these were very embarrassing situations for me.

My husband saw all of this and began sending emails to our HR department to demand that the law be followed. He sent copies of the law to the HR department. He called the regional HR director Harth to get him involved and to be sure that he was in the loop. All of this fell on deaf ears until he sent the E-mail entitled "Letter to Harth" (included with this complaint) that the issue was escalated to the internal investigations department.

Even with an ongoing investigation, the company was relentless in opposition to my pumping. In the beginning of this complaint I mentioned that Joseph Fenderson and myself would help each other out so that one of us could have time to do other things. This was Charters next try to limit my ability to pump however this one included the added benefit to Charter of preventing me or my husband from picking up my daughter from daycare at the end of our shifts so I have time to stop between jobs to pump. They instituted a policy that only applied to Joseph Fenderson and myself. Jen told us that we are no longer aloud to talk to each other about anything work related nor are you aloud to take work from one another and she furthermore stated that this has been the policy all along. Jen said to me "we work until were done and if you can't comply with that then you should look for a new job".

First, they denied my ability to pump and pick up my daughter and then they went further and blocked the solutions that I came up with on my own.

There were several emails that went back and forth from the local HR department where Heidi specifically states that "Charter is not required to allow me to pump because it would be a hardship on the company".

Following this exchange, I fought for a meeting with HR and my supervisor so that we can come up with a plan. This meeting was pushed for 2 days and only happened after I got the Maine department of labor involved. The attendees at the meeting consisted of myself, Jen Gorgone and Diane Thornton. They offered a solution that I pump in my truck when time permitted and that if I could find something to drape over me that was not too expensive then maybe the company would buy the item. They went on to say that they would limit my jobs to six a day and not give me any "no contact" jobs (sro).

To this I said that our jobs take 1.5 hours so, 6 jobs would take 9 hours and that's not including travel time, breaks, lunch or pumping. To add to this, on the very day that this "agreement" was reached, it was violated because they did not provide time to pump, I had 2 "no contact" jobs and I did not get a lunch. When I told of HR director Diane that I was not going to have time for lunch or pump she replied, "What do u want me to do about it?" This was literally at the end of the meeting that we had that guaranteed these things to me.

More emails were exchanged, and my family was moving to a different town. I have an email from Heidi stating that I can work in this new town so that I can pump as a possible solution but when it came time for that the offer had changed to something designed to make my life harder. Diane claimed that due to business need, my pumping could not be accommodated in that way and now I was to drive over an hour each morning to work in Portland and I could come back to the office in Portland at 10, 12 and 2 for pumping. This was not going to work as it created new challenges. First, they refuse to control the jobs that I get so for example: This would be my day had this solution been excepted. I would wake up at 5 to pump then leave my house at 6 in my personal car to take my daughter to daycare and return home to pick up my work truck by 6:45. Then I would drive to Portland and arrive at 8 and at that time I need to pump because it has been 3 hours since the last time. After pumping I would leave the office by 8:45 to travel to my first job. After I arrive and do the job it would be 11 then I travel back to the office to pump by 12 because by the nature of the plan, I could never make it back by ten. Then go have lunch and so on. Its easy to see how this wouldn't work with 6 jobs. And now I would be working in Portland, the largest city in Maine so there will be no chance to pump on the side of the road because of all the people everywhere as if that was ever an acceptable option. When I mentioned this to Diane Thornton she replied "hmmmm.. that's the offer".

I went to EEOC website at the beginning of all this to find what other telecommunications workers did to solve their issues with regard to time and place for pumping. I found that if they work in their area then they just go home as needed for pumping. I asked for this early on and again when I was presented with this offer. The request was denied both times as Charter said that it would be a hardship.

I gave my two weeks' notice because Charter was not acting in good faith with regard to my pumping and when they made a "plan" they refused to stick to it. Harth from our regional HR department called me about a week later to offer me what I was requesting from day 1. I loved my job, so I took the weekend to think about it before rejecting the offer for the same reasons stated above. It has gone on far to long, damage has been done to me and my family. (BTW for my husband's efforts on my behave he was written up for the first time ever with no explanation in a secret meeting that he was not aloud to know about until the meeting began.) As well as the fact that Charter has shown with empirical evidence, each and every time that they are incapable of following through on what they say they will do.

-Samantha Fenderson



RECEIVED
APR 0 2 2018
U.S. E.E.O.C
Boston Area Office

CP Enclosure with EEOC Form 5 (11/09)

PRIVACY ACT STATEMENT:  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.    FORM NUMBER/TITLE/DATE.  EEOC Form 5, Charge of Discrimination (11/09).

2.    AUTHORITY.  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.    PRINCIPAL PURPOSES.  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.    ROUTINE USES.  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.    WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# EXHIBIT D



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Boston Area Office**

John F. Kennedy Federal Building
Government Center
Room 475
Boston, MA 02203-0506
(617) 565-3200
TTY (617) 565-3204
FAX (617) 565-3196

July 1, 2019

**VIA EEOC'S RESPONDENT PORTAL AND ELECTRONIC MAIL**

Charter Communications
c/o Paul Klein, Esq.
12405 Powerscourt Drive
St. Louis, MO 63131
paul.klein@charter.com

Re:   ████████████████████████████

   Samantha Fenderson v. Charter Communications
   EEOC Charge No. 523-2018-00971

## REQUEST FOR INFORMATION

Dear Respondent:

   The above-referenced charges have been assigned to me for investigation. To fulfill the EEOC's statutory obligation to investigate charges of employment discrimination, the EEOC or its designated representative shall at all reasonable times have access to, for the purposes of examination and the right to copy, any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by the act and is relevant to the charge under investigation. Section 710 of Title VII incorporates by reference the subpoena authority in Section 11 of the National Labor Relations Act. Section 7(a) of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 626(a) incorporates by reference Sections 9 and 11 of the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. §§ 209 and 211. Under these provisions, EEOC has the power to require by subpoena the attendance and testimony of witnesses and the production of, or access to, all such evidence relating to any matter under investigation.

   At this time, additional information is required in order to proceed with our investigation. You are advised that we may seek additional evidence regarding the allegations in the charge, as well as any evidence relating to other possible violations that may come to light during the course of our investigation, until a determination on the merits can be made. Accordingly, please submit a response to each of the following requests with Respondent's position statement, via the EEOC's Respondent Portal. Where a list is requested, please submit it in the form of an electronic database.[1]

---

[1] "Electronic database" shall mean an electronic file that can be opened and sorted by Microsoft Excel (such as Microsoft Excel Files (".XLS") and comma delimited files (".CSV")) wherein the first row of the database contains

A request for information was sent to Respondent, via email, on March 25, 2019; the response to that request was due April 25, 2019. To date, Respondent has failed to provide a response. To the extent the information requested below is duplicative of that requested on March 25, 2019, it is because Respondent has, to date, failed to provide a response to the earlier request. Please submit your response to this request no later than **July 23, 2019.**

1. Provide a full and complete statement of position and response to the allegations in the charges identified above.

2. Provide a complete copy of Charging Party ███████ personnel file, including all documents relating to hire, compensation, benefits, discipline, performance, position(s) held, position(s) sought, attendance, leaves of absence, termination, and eligibility for re-hire.

3. Provide a copy of any arbitration agreement signed by ███████

4. Provide a complete copy of Charging Party Samantha Fenderson's personnel file, including all documents relating to hire, compensation, benefits, discipline, performance, position(s) held, position(s) sought, attendance, leaves of absence, termination, and eligibility for re-hire.

5. Provide a copy of any arbitration agreement signed by Samantha Fenderson.

6. All documents related to Samantha Fenderson's pregnancy, request for information related to leave and/or disability benefits, request for short-term disability leave, request for new uniform (e.g., better-fitting pants, larger shirt), request for light duty, request for assistance finding times and locations to express breast milk, and/or request for a reasonable accommodation, including, without limitation, any correspondence or document relating to communications, between Samantha Fenderson and Respondent or between Joe Fenderson and Respondent.

7. A description of all benefits provided by Respondent through Sedgwick that were available to Field Technicians in 2017.

8. Documents related to any complaint made by ███████ through Respondent's "open door policy."

9. Documents related to any investigation undertaken by Respondent into any complaint (whether internal or external) made by either ███████ or Samantha Fenderson.

10. Documents relating to any policy or procedure of Respondent's in place at any time since September 1, 2016 concerning any of the following: pregnancy discrimination,

---

the field or variable names of the requested information and each subsequent row of the database shall contain the requested information for each individual or thing identified. Image files (such as PDF or TIFF files) and printed copies of the database do not satisfy this request. If an electronic file is too large to be delivered via the EEOC's Respondent Portal, Respondent shall submit the oversized electronic file on a USB Flash Drive.

pregnancy leave, reasonable accommodation, light duty, short-term disability, lactation, parental leave, family leave, retaliation, and nepotism.

11. All job descriptions in use for the position of Field Technician at any time since September 1, 2016.

12. All documents describing the policies or procedures in place in 2017 for assigning work to Field Technicians, including policies or procedures for assigning Field Technicians to teams or geographic areas.

13. A job description for the position held by Jennifer Gorgone during the period from September 1, 2016 through January 1, 2018.

14. Provide a list of all employees working in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, or Connecticut, who, at any time since September 1, 2016, requested a reasonable accommodation to a disability.  For each employee provide:

    a.  Last name;
    b.  First name;
    c.  Sex;
    d.  Social Security number;
    e.  Address;
    f.  Phone number;
    g.  Position/job title at time of request;
    h.  Work location;
    i.  Date of request; and
    j.  Indicate whether an accommodation was provided.

15. Provide a list of all employees working in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, or Connecticut, who, at any time since September 1, 2016, requested a reasonable accommodation to a condition related to pregnancy and/or child birth.  For each employee provide:

    a.  Last name;
    b.  First name;
    c.  Sex;
    d.  Social Security number;
    e.  Address;
    f.  Phone number;
    g.  Position/job title at time of request;
    h.  Work location;
    i.  Date of request; and
    j.  Indicate whether an accommodation was provided

Please also feel free to provide any additional information that you deem relevant to the investigation of this matter.  If you have any questions, please contact me at (617) 565-3192.

Sincerely,

Anthony Pino
Enforcement Supervisor

# EXHIBIT E

# HUSCH BLACKWELL

Kaytlin E. Kopen
Attorney

190 Carondelet Plaza, Suite 600
St. Louis, MO  63105
Direct: 314.345.6304
Fax: 314.480.1505
kayt.kopen@huschblackwell.com

August 16, 2019

**VIA ELECTRONIC & FIRST CLASS MAIL**

Anthony M. Pino, Jr.
Enforcement Supervisor
U.S. Equal Employment Opportunity Commission
Boston Area Office
John F. Kennedy Federal Building
Government Center, Room 475
Boston, MA 02203
anthony.pino@eeoc.gov

**Re:    *Samantha Fenderson v. Charter Communications, Inc.***
        **EEOC Charge No. 523-2018-00971**

Dear Mr. Pino,

Charter Communications, Inc. ("Charter") respectfully submits this response to the Commission's July 1, 2019 Request for Information in connection with the above-referenced charge of discrimination ("Charge") filed by Samantha Fenderson ("Charging Party").

1.    On August 16, 2019, Charter submitted a full and complete statement of position in response to the Charge.

2.    ████████████████████████████████████████████████████████████████████████████████

3.    No such document exists.  Charter's binding arbitration agreement is an opt-out agreement.

4.    Charging Party's personnel file is enclosed as <u>Exhibit A</u>.

5.    No such document exists.  Charter's binding arbitration agreement is an opt-out agreement.

Husch Blackwell LLP

# HUSCH BLACKWELL

6.     Charging Party's medical file is enclosed as <u>Exhibit B</u>.  Other such documents are attached to Charter's August 16, 2019 Statement of Position

7.     Charter's 2017 Benefits Guide is enclosed as <u>Exhibit C</u>.

8.     ███████████████████████████████████████████████████  To the extent Request No. 8 asks for documents that are not related to Charging Party, Charter objects to Request No. 8 as overly broad, not properly limited in subject matter scope, and not relevant to Charging Party's claims.  Charter also objects to Request No. 8 to the extent it requests documents protected by the attorney-client privilege and/or work product doctrine.

9.     Documents related to the investigation undertaken by Charter into the complaint made by Charging Party ████████████████ regarding Charging Party are attached to Charter's August 16, 2019 Statement of Position.  To the extent Request No. 9 asks for documents that are not related to Charging Party, Charter objects to Request No. 9 as overly broad, not properly limited in subject matter scope, and not relevant to Charging Party's claims.  Charter also objects to Request No. 9 to the extent it requests documents protected by the attorney-client privilege and/or work product doctrine.

10.     Charter's Equal Employment Opportunity Policy Statement, Code of Conduct, and Accommodation of Disabilities Policy are attached to Charter's August 16, 2019 Statement of Position.  The other policies requested are enclosed herewith as <u>Exhibit D</u>.

11.     The Field Technician job descriptions are enclosed as <u>Exhibit E</u>.

12.     Charter is currently unaware of any documents responsive to this request beyond what is already enclosed.

13.     The Supervisor, Field Operations job description is enclosed as <u>Exhibit F</u>.

14.     Charter objects to Request No. 14 as overly broad; unduly burdensome; not properly limited in temporal, geographic, or subject matter scope; not proportional to the needs of the case; not relevant to Charging Party's claims; and seeking confidential medical information from individuals who are not parties to this Charge and who have not consented to the disclosure of such information.

15.     Charter objects to Request No. 15 as overly broad; unduly burdensome; not properly limited in temporal, geographic, or subject matter scope; not proportional to the needs of the case; not relevant to Charging Party's claims; and seeking confidential medical information from individuals who are not parties to this Charge and who have not consented to the disclosure of such information.

DocID: 4816-9890-7041.1

# HUSCH BLACKWELL

Please do not hesitate to contact me with further questions.

Sincerely,

*/s/ Kaytlin E. Kopen*

Kaytlin E. Kopen
Attorney

KEK
Enclosures

DocID: 4816-9890-7041.1

# EXHIBIT F



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Boston Area Office**

John F. Kennedy Federal Building
Government Center
Room 475
Boston, MA 02203-0506
(617) 565-3200
TTY (617) 565-3204
FAX (617) 565-3196

October 28, 2019

**VIA EEOC'S RESPONDENT PORTAL AND ELECTRONIC MAIL**

Charter Communications
c/o Kaytlin E. Kopen, Esq.
Husch Blackwell
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
kayt.kopen@huschblackwell.com

Re:     Samantha Fenderson v. Charter Communications
        EEOC Charge No. 523-2018-00971

<u>**REQUEST FOR INFORMATION**</u>

Dear Respondent:

The above-referenced charges have been assigned to me for investigation. To fulfill the EEOC's statutory obligation to investigate charges of employment discrimination, the EEOC or its designated representative shall at all reasonable times have access to, for the purposes of examination and the right to copy, any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by the act and is relevant to the charge under investigation. Section 710 of Title VII incorporates by reference the subpoena authority in Section 11 of the National Labor Relations Act. Section 7(a) of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 626(a) incorporates by reference Sections 9 and 11 of the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. §§ 209 and 211. Under these provisions, EEOC has the power to require by subpoena the attendance and testimony of witnesses and the production of, or access to, all such evidence relating to any matter under investigation. <u>See</u> <u>McLane Co., Inc. v. EEOC</u>, 137 S. Ct. 1159, 1165 (2017) (at the investigative stage, the construction of "relevance" is a generous one); <u>EEOC v. Shell Oil Co.</u>, 466 U.S. 54, 68-69 (1984) (relevance, in context of EEOC investigation, is defined as "virtually any material that might cast light on the allegations against the employer.").

At this time, additional information is required in order to proceed with our investigation. You are advised that we may seek additional evidence regarding the allegations in the charge, as well as any evidence relating to other possible violations that may come to light during the course of our investigation, until a determination on the merits can be made. Accordingly, please submit a response to each of the following requests with Respondent's position statement, via

the EEOC's Respondent Portal. Where a list is requested, please submit it in the form of an electronic database.[1]

Please submit your response to this request no later than **November 15, 2019.**

1. Provide a list of all Field Technicians working in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, or Connecticut, who, at any time since September 1, 2016, requested a reasonable accommodation to a disability. For each employee provide:

   a. Last name;
   b. First name;
   c. Sex;
   d. Address;
   e. Personal phone number;
   f. Position/job title at time of request;
   g. Work location;
   h. Date of request;
   i. Work restriction;
   j. Indicate whether an accommodation was provided; and
   k. If an accommodation was provided, describe the accommodation.

2. Provide a list of all Field Technicians working in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, or Connecticut, who, at any time since September 1, 2016, requested a reasonable accommodation to pregnancy, a condition related to pregnancy, and/or child birth. For each employee provide:

   a. Last name;
   b. First name;
   c. Sex;
   d. Address;
   e. Personal phone number;
   f. Position/job title at time of request;
   g. Work location;
   h. Date of request;
   i. Work restriction;
   j. Indicate whether an accommodation was provided; and
   k. If an accommodation was provided, describe the accommodation.

---

[1] "Electronic database" shall mean an electronic file that can be opened and sorted by Microsoft Excel (such as Microsoft Excel Files (".XLS) and comma delimited files (".CSV")) wherein the first row of the database contains the field or variable names of the requested information and each subsequent row of the database shall contain the requested information for each individual or thing identified. Image files (such as PDF or TIFF files) and printed copies of the database do not satisfy this request. If an electronic file is too large to be delivered via the EEOC's Respondent Portal, Respondent shall submit the oversized electronic file on a USB Flash Drive.

3. Provide copies of all policies, protocols or procedures that Respondent has had in place, at any time since January 1, 2016, concerning accommodations for individuals with lifting restrictions.

4. Provide copies of all policies, protocols or procedures that Respondent has had in place, at any time since January 1, 2016, concerning accommodations for individuals with restrictions caused by on-the-job injuries.

5. Provide copies of all policies, protocols or procedures that Respondent has had in place, at any time since January 1, 2016, concerning light duty and/or modified duty.

6. Provide copies of all policies, protocols or procedures that Respondent has had in place, at any time since January 1, 2016, concerning reassignment as an accommodation to a disability or other restriction on an employee's ability to work.

7. Documents previously produced by Respondent indicate that Charging Party initially requested an accommodation to a lifting restriction and restriction on heights. Provide copies of all documents concerning Respondent's receipt and evaluation of that request and identify the individual(s) employed by Respondent who decided to deny that request.

8. Provide documents related to any policies or protocols Respondent has had in place at any time since January 1, 2016 concerning uniforms for Field Technicians, including how uniforms are provided to Field Technicians, how Field Technicians can request a different size, and the availability of maternity pants. In addition, if Respondent has ever provided a Field Technician with pants or any other part of the uniform to accommodate changes in the Field Technician's body due to pregnancy, please provide examples (including name of the employee, job title, job location, date of action, address and telephone number).

Please also feel free to provide any additional information that you deem relevant to the investigation of this matter. If you have any questions, please contact me at (617) 565-3192.

Sincerely,

Anthony Pino
Enforcement Supervisor

# EXHIBIT G

# HUSCH BLACKWELL

Kayt Kopen
Attorney

190 Carondelet Plaza, Suite 600
St. Louis, MO  63105
Direct: 314.345.6304
Fax: 314.480.1505
kayt.kopen@huschblackwell.com

November 15, 2019

**VIA ELECTRONIC & FIRST CLASS MAIL**

Anthony M. Pino, Jr.
Enforcement Supervisor
U.S. Equal Employment Opportunity Commission
Boston Area Office
John F. Kennedy Federal Building
Government Center, Room 475
Boston, MA 02203
anthony.pino@eeoc.gov

       **Re:**    *Samantha Fenderson v. Charter Communications, Inc.*
               **EEOC Charge No. 523-2018-00971**

Dear Mr. Pino,

      Charter Communications, Inc. ("Charter") respectfully submits this response to the Commission's October 28, 2019 Request for Information in connection with the above-referenced charge of discrimination ("Charge") filed by Samantha Fenderson ("Charging Party").

      1.      Charter objects to Request No. 1 as overly broad, unduly burdensome, not properly limited in temporal or geographic scope, not proportional to the needs of the case, not relevant to Charging Party's claims in this matter, and seeking confidential medical information from individuals who are not parties to this Charge and who have not consented to the disclosure of this information.  Charter further objects to this request as harassing, as this is the third time the Commission has requested this information despite Charter's proper objections, and the Commission refuses to reasonably narrow its request.

      2.      Charter objects to Request No. 2 as overly broad, unduly burdensome, not properly limited in temporal or geographic scope, not proportional to the needs of the case, not relevant to Charging Party's claims in this matter, and seeking confidential medical information from individuals who are not parties to this Charge and who have not consented to the disclosure of this information.  Charter further objects to this request as harassing, as this is the third time

## HUSCH BLACKWELL

the Commission has requested this information despite Charter's proper objections, and the Commission refuses to reasonably narrow its request.

3.      Charter's Reasonable Accommodations Policy is enclosed with this correspondence as <u>Exhibit A</u>. Charter also refers the Commission to its Employee Handbook, which was produced to the Commission on August 16, 2019.

4.      Charter refers the Commission to Exhibit A and to its Employee Handbook.

5.      Charter refers the Commission to Exhibit A and to its Employee Handbook.

6.      Charter refers the Commission to Exhibit A and to its Employee Handbook.

7.      Charging Party did not request a lifting or height restriction, and Charter never denied such a request.  After Charging Party expressed some concern about climbing ladders and carrying heavy equipment, Charter initiated the interactive process.  What Charging Party requested as an accommodation was a leave of absence.  Charter granted Charging Party's request.

8.      Upon hire, new employees are given the website address to Charter's third-party uniforms vendor, Affinity.  Charter provides new employees with a clothing allowance, and employees are able to log into Affinity's website and order their uniforms.  Charter instructs employees to notify their supervisor if they experience any problems with their uniforms or have any questions.  Once employees have ordered their uniforms the first time, they know where to go and how to order additional items if they need replacements or different sizes.  Each year, employees are allocated additional money to order new or replacement clothing.

Charter's Professional Appearance Policy, along with guidelines regarding appearance and uniforms, are enclosed with this correspondence as <u>Exhibit B</u>.  Charter also refers the Commission to its Employee Handbook.

To the extent Request No. 8 asks for more, Charter objects to the request as overly broad, unduly burdensome, not properly limited in temporal or geographic scope, not proportional to the needs of the case, and requesting confidential medical information regarding individuals who are not parties to this Charge and who have not consented to the disclosure of this information.  Furthermore, as stated in Charter's August 16, 2019 Statement of Position, Charging Party never requested different clothing due to her pregnancy.

2

**HUSCH BLACKWELL**

Please do not hesitate to contact me with further questions.

Sincerely,

*/s/ Kaytlin E. Kopen*

Kaytlin E. Kopen
Attorney

KEK
Enclosures

3

# EXHIBIT A

Official Company Policy



| Corporate Policy: | Effective Date: |
|---|---|
| **Reasonable Accommodations** | **August 1, 2019** |
| Department Owner: | Applicable To: |
| **Corporate Human Resources** | **All Employees** |

## CONTENTS

| 1.0 | **PURPOSE** | 1 |
|---|---|---|
| 2.0 | **SCOPE** | 2 |
| 3.0 | **POLICY** | 2 |
| 3.1 | Eligibility for Reasonable Accommodations | 2 |
| 3.2 | Examples of Reasonable Accommodations | 2 |
| 3.3 | Requesting a Reasonable Accommodation | 2 |
| 3.4 | Making the Accommodation Decision | 3 |
| 3.5 | Communications | 3 |
| 3.6 | Applicants | 4 |
| 3.7 | No Retaliation | 4 |
| 4.0 | **REPORTING CONCERNS** | 4 |
| 5.0 | **CONTACTS** | 4 |
| 6.0 | **RELATED POLICIES** | 5 |

## 1.0   PURPOSE

Charter is committed to creating a diverse and inclusive environment for all individuals. It is Charter's policy not to discriminate against qualified individuals with disabilities in regard to application procedures, hiring, promotion, discharge, compensation, training or other terms, conditions and privileges of employment. It is also Charter's policy to provide a professional work environment free of harassment of any kind, including harassment on the basis of physical or mental disability status.

Charter complies with all applicable provisions of the Americans with Disabilities Act (ADA) and its amendments, and state and local disability laws, and will provide reasonable accommodations with regard to applying for jobs and with regard to the terms, conditions, and privileges of employment, with the goal of helping employees to perform the essential functions of the job.

This Policy describes who may be eligible to receive accommodations, types of accommodations that may be available, how to request an accommodation, and the individual's and Charter's role in the accommodation process.

## 2.0   SCOPE

This Policy applies to all employees, including full-time, part-time, and temporary employees, and applicants for employment with Charter.

## 3.0   POLICY

### 3.1   Eligibility for Reasonable Accommodations

Employees and applicants who are qualified individuals with disabilities may be eligible for a reasonable accommodation. A qualified individual with a disability is an employee or applicant with a physical or mental impairment that substantially limits one or more major life activities or has a record of such a condition, and who can perform the essential functions of the job, with or without an accommodation provided by Charter. Essential functions of the job are generally the fundamental duties of the job, or the reasons the job is needed.

### 3.2   Examples of Reasonable Accommodations

Charter recognizes that employees or applicants may have or experience physical or mental impairments that affect their ability to perform their job, and is committed to exploring effective reasonable accommodations with regard to all terms, conditions, benefits, and privileges of employment and to allow employees or applicants to succeed in their jobs or application for employment.

Reasonable accommodations are changes to the job, work environment or schedule that allow an employee to perform the essential functions of the job, unless the accommodations would create an undue hardship for Charter or pose a significant risk to the safety of the employee or others, or would fundamentally alter the nature of the job.

Accommodations can take many forms, including for example, adjustments to work schedules, the work space, and facilities and equipment, additional training, and changes to the way job duties are performed.

While working with individuals under these circumstances to identify ways they can perform their jobs is a priority, Charter also provides as an accommodation intermittent leave and continuous leave if providing such types of leave will not impose an undue hardship on Charter and there is reason to believe that the leave will enable the employee to remain at or return to work, Charter will provide such leaves when there is no other workplace accommodation that will allow the employee to perform the essential job duties.

### 3.3   Requesting a Reasonable Accommodation

**CONTACT HUMAN RESOURCES**

Except in limited circumstances, it is the responsibility of the employee or applicant to notify Charter if a reasonable accommodation is needed. To request a reasonable accommodation, employees should first contact their local Human Resources representative, in person or by phone. Employees are encouraged to complete the Employee Job Accommodation Request Form, in additional to contacting Human Resources by phone or in person. This form can be obtained from and should be submitted to your local Human Resources representative.

**HEALTH CARE PROVIDER QUESTIONNAIRE**

In general, employees or applicants must provide to Charter written information from their health care provider explaining (1) why they require the particular accommodation being requested and (2) how the accommodation will enable them to perform the essential functions of the job. The Health Care Provider Questionnaire completed by the health care provider can be obtained from and should be submitted to your local Human Resources representative. Charter keeps medical information received from the employee, applicant, or health care provider in a confidential and separate medical file.

## 3.4    Making the Accommodation Decision

**EVALUATING THE REQUEST**

The following steps are taken to evaluate the request for a reasonable accommodation:

- After an employee or applicant requests an accommodation and submits required medical documentation, Human Resources and the employee's supervisor will explore the availability of reasonable accommodations.

- Charter will meet with the employee or applicant to discuss possible effective reasonable accommodations.

- Charter will make an individualized determination of an appropriate accommodation. What is reasonable and effective for one employee, may not be effective or reasonable for another employee. And while employees may not always receive their preferred choice of an accommodation, Charter works with each employee and is committed to identifying an accommodation that is effective and reasonable under the circumstances.

**COMMUNICATING THE DECISION**

Human Resources will notify the employee or applicant who requested an accommodation of Charter's decision in writing, which includes any accommodations that have been approved and their duration. The employee may accept an offered accommodation verbally or in writing.

**STAYING ENGAGED**

Charter follows up with employees who are granted accommodations to learn how the accommodation is working. If an employee believes an accommodation is not working, the employee should promptly notify his or her supervisor or Human Resources to discuss possible alternatives.

**EMPLOYEE SAFETY**

All employees must comply with Charter safety rules at all times. Employees and applicants will not be placed in or retained in, positions where, with or without a reasonable accommodation, they would create a direct threat to the safety or health of themselves or others.

## 3.5    Communications

**INTERACTIVE EXCHANGE OF INFORMATION**

Charter engages in an interactive exchange of information and ideas with individuals when evaluating a request for a reasonable accommodation. This means that Charter will have questions for the employee or health care provider and may suggest possible accommodations for them to consider, and that the

employee (and his or her health care provider) is expected to provide information and his or her own ideas for accommodations to Charter as part of this interaction.

**COOPERATION AND EFFICIENCY**

Charter will promptly and efficiently communicate with individuals during the reasonable accommodation process, and the requesting employee is expected to cooperate and timely provide information requested by Charter, so that it can appropriately evaluate the request. An employee's failure to timely provide this information to Charter may result in a denial of the request.

## 3.6   Applicants

Applicants for a Charter position may request a reasonable accommodation related to the job application process. Applicants should submit these requests to the Charter recruiter. Charter will coordinate directly with an applicant to collect information from the applicant as needed to evaluate the request and to communicate to the applicant a reasonable accommodation related to the application process.

## 3.7   No Retaliation

An individual's exercise of rights under this Policy will not adversely affect the terms and conditions of his or her employment nor employment decisions such as promotions or corrective action. However, an individual is not entitled to any benefits or favorable treatment because of the exercise of rights under this Policy.

## 4.0   REPORTING CONCERNS

Charter will not tolerate disability discrimination in its workplace, and will take immediate and appropriate corrective action, up to and including termination of employment, if such conduct or violation of this Policy occurs. Charter also prohibits retaliation against any individual who reports disability discrimination or provides information related to such a report.

To report a concern related to this Policy or of disability discrimination, you may contact:

- Human Resources
- EthicsPoint, a third-party compliance and ethics hotline (https://chartercommunications.ethicspoint.com or 866-384-4277)
- Charter's Employee Relations Center of Excellence, through EthicsPoint
- Solution Channel, Charter's program for resolution of employment-based disputes (https://panorama.charter.com/ReportIssue/SolutionChannel)

A timely and appropriate investigation of a reported concern will be conducted. Through EthicsPoint and each of these avenues for reporting a concern, Charter and the reporter may communicate in writing regarding the status and results of the investigation (including whether remedial steps were taken).

## 5.0   CONTACTS

Questions regarding this Policy should be addressed first with your Human Resources representative. You may also contact the Employee Services Center at 1-877-892-4372 or ESC.ADA@charter.com.

## 6.0   RELATED POLICIES

Family and Medical Leave Policy

Equal Employment Opportunity Policy

Employee Handbook

# EXHIBIT B



| Corporate Policy: | Last Revised: |
|---|---|
| **Professional Appearance** | **February 2018** |
| Department Owner: | Applicable To: |
| **Corporate Human Resources** | **All Employees** |

## 1.0    PURPOSE

Charter employees are expected to maintain an overall professional appearance that will enhance Charter's image in the community and in the industry. A professional appearance reflects respect for both customers and co-workers, and is critical to success in a service-related business.

## 2.0    SCOPE

This policy applies to all Charter employees.

## 3.0    POLICY

Charter employees are expected to wear proper business attire at all times and, if working in a department that requires a uniform, dress in the appropriate uniform every day.

Healthy grooming habits are also essential to maintaining a professional appearance.

### UNIFORMS

Employees who interact with our customers in person (e.g. technicians, outside sales reps, retail associates, etc.) are generally required to wear Spectrum branded uniforms that meet the comfort and safety requirements for the position, department, and/or work location.

Consult with your supervisor for details regarding any work uniform requirements that may be relevant to you.

### PROFESSIONAL BUSINESS ATTIRE

Any Charter employee who is not required to wear a uniform is expected to dress in Business or Business Casual attire, which generally incudes:

- Women - blouses, dress slacks, skirts, suits, dresses and dress shoes
- Men – dress shirts, dress slacks, suits, sports jackets and dress shoes

Examples of <u>unacceptable</u> business attire includes, but is not limited to, the following:

- jeans, stretch pants, exercise apparel, shorts or short skirts
- t-shirts; tank tops; sheer, low cut or open midriff tops
- sneakers or flip-flops
- apparel that displays unprofessional text and/or images
- clothing that is ripped or torn (even when part of the design)

Employees are generally expected to maintain a professional appearance, use good judgement, and dress in a manner that appropriately reflects their position, interactions, and agenda for the day. When in doubt, check with your supervisor for guidance.

## 4.0   ENFORCEMENT

Any employee who fails to adhere to this policy may be sent home, without pay, to rectify the situation. Blatant or repeated violations of this policy may lead to disciplinary action, up to and including termination of employment.

## 5.0   CONTACTS

Questions regarding this policy should be addressed to your immediate supervisor or Human Resources representative.

programming or content, or otherwise failing to meet standards of common decency. In addition, unprofessional conduct includes sleeping or engaging in horseplay or recreational activities while on the job.

(BACK TO TOP)

## Appearance

### *Professional Appearance Guidelines*

All employees are expected to maintain an overall professional appearance that will enhance Charter's image in the community and in the industry.   A professional appearance reflects respect for both customers and co-workers, and is critical to success in a service-related business.   Charter has designated certain dress and grooming standards for the work environment.   However, safety, comfort, geographic location, and the guidelines of your particular work area will determine the appropriate dress and grooming standards.  Thus, your supervisor may provide specific details (in addition to the standards noted below) regarding work attire appropriate for your position, department, or work location.  All employees are expected to wear proper business attire at all times and, if working in a department that requires a uniform, dress in the appropriate uniform every day.

(BACK TO TOP)

### *Uniforms*

In addition, some employees are required to wear a designated uniform.  You should also consult with your supervisor for more specific appearance guidelines applicable to your position.  If you have doubts regarding the appropriateness of work attire, you should consult your supervisor prior to wearing the attire in question.

Occupational Safety and Health Administration ("OSHA") requirements dictate use of long-sleeved shirts, long pants, and specific boots for pole climbing operations.  Each employee involved in pole climbing should have at least one long-sleeved shirt to carry in the vehicle during summer months and one pair of boots suitable for climbing.   Charter recognizes that protective footwear may be a requirement in a number of jobs.  For this reason, Charter will pay for the cost of approved safety footwear up to a maximum limit.  Should you choose to purchase safety footwear that costs more than the allotted dollar amount, you will be responsible for paying any amount over the maximum limit.   You may be given the opportunity to pay the excess amount through payroll deductions.

Employees who fail to adhere to this policy may be sent home, without pay, to rectify the situation, and/or may be subject to corrective action.  If you require a modification to these guidelines as part of your religious observance, contact your local Human Resources representative.

# EXHIBIT H



**From:** ANTHONY PINO [mailto:ANTHONY.PINO@EEOC.GOV]
**Sent:** Thursday, December 12, 2019 9:36 AM
**To:** Kopen, Kayt <Kayt.Kopen@huschblackwell.com>
**Subject:** S. Fenderson v. Charter Communications, 523-2018-00971, Request for additional information

[EXTERNAL EMAIL]

Good Morning Attorney Kopen,

Below is a request for additional information regarding the above referenced EEOC matter. I respectfully request that this information be submitted on or before **December 18, 2019.**

1. Please provide me with any/all email correspondences and notes between Respondent, Charter Communications and Respondents Leave and Disability Administrator, Sedegwick.
2. Please provide me with the email link to Affinity and the point of contact who handles the Charter Communications account for uniforms.

Thank you.
Sincerely,

Anthony

*Anthony M. Pino, Jr.*

Anthony M. Pino, Jr.
Enforcement Supervisor
U.S Equal Employment Opportunity Commission
Boston Area Office
JFK Federal Building, Room 475
Government Center
Boston, MA  02203



# EXHIBIT I

# HUSCH BLACKWELL

Kayt Kopen
Attorney

190 Carondelet Plaza, Suite 600
St. Louis, MO  63105
Direct: 314.345.6304
Fax: 314.480.1505
kayt.kopen@huschblackwell.com

December 13, 2019

**VIA ELECTRONIC & FIRST CLASS MAIL**

Anthony M. Pino, Jr.
Enforcement Supervisor
U.S. Equal Employment Opportunity Commission
Boston Area Office
John F. Kennedy Federal Building
Government Center, Room 475
Boston, MA 02203
anthony.pino@eeoc.gov

> **Re:** *Samantha Fenderson v. Charter Communications, Inc.*
> **EEOC Charge No. 523-2018-00971**

Dear Mr. Pino,

Charter Communications, Inc. ("Charter") respectfully submits this response to the Commission's December 12, 2019 Request for Information in connection with the above-referenced charge of discrimination ("Charge") filed by Samantha Fenderson ("Charging Party").

1.      Charter refers the Commission to Charging Party's Sedgwick file, which was produced to the Commission on August 16, 2019.

2.      The link to Affinity is as follows:  https://www.affinityapparel.com/
To the extent Request No. 2 asks for more, Charter objects to this request as overly broad and not relevant to the Charge.

To date, Charter has provided the Commission with a statement of position, a supplemental statement of position, and responses to <u>each</u> of the Commission's <u>four</u> separate requests for information. Charter has fully and willingly cooperated with the Commission's investigation and has provided an abundance of information and documentation, including nearly one thousand pages of records.

**HUSCH BLACKWELL**

This December 13, 2019 correspondence, however, will serve as Charter's final response to the Commission's requests for additional information.  The Commission has an obligation to conduct its investigation in a way that is minimally burdensome and disruptive to Charter's business operations.  At this point, the Commission's numerous, repetitive, and overly broad requests for irrelevant information have become unduly burdensome. The Commission has ample evidence to support a dismissal of Charging Party's Charge.

We trust that the information and supporting documentation provided to the Commission to date will enable the Commission to issue a no probable cause finding and dismiss Charging Party's Charge in its entirety.

Sincerely,

*/s/ Kaytlin E. Kopen*

Kaytlin E. Kopen
Attorney

KEK

2

# EXHIBIT J

EEOC Form 136
(11/09)

# UNITED STATES OF AMERICA

### EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# SUBPOENA

TO:  Thomas M. Rutledge, CEO                                    NO: NY-A20-006
Charter Communications
12405 Powerscourt Dr., Legal Dep't
St. Louis, MO 63131

IN THE MATTER OF:  Samantha Fenderson v. Charter Communications

Charge No. 523-2018-00971

Having failed to comply with previous request(s) made by or on behalf of the undersigned Commission official, YOU ARE HEREBY REQUIRED AND DIRECTED TO:

☐ Testify before:              ☐ Produce and bring * or     ☒ Mail * the documents described below to:

☐ Produce access to the evidence described below for the purpose of examination or copying to:

Anthony Pino, Enforcement Supervisor                          of the Equal Employment Opportunity Commission

at  JFK Bldg., Rm 475, Government Ctr., Boston, MA 02203     on January 9, 2020          at            o'clock

The evidence required is
See Attachment A

This subpoena is issued pursuant        ☐ (Title VII) 42 U.S.C. 2000e-9    ☐ (ADEA) 29 U.S.C. 626(a)    ☐ (EPA) 29 U.S.C. 209
☒ (ADA) 42 U.S.C. 12117(a)    ☐ (GINA) 42 U.S.C. 2000ff-6

ISSUING OFFICIAL (Typed name, title and address)          ON BEHALF OF THE COMMISSION
Feng An, Office Director
Boston Area Office
JFK Federal Building, Room 475
Government Center
Boston, MA 02203                                                12-19-19
                                                                    Date

*NOTICE TO PERSON SUBPOENAED - The Commission will not pay witness fees or travel expenses for the delivery of required documents to a Commission office unless the box "Testify before" is also checked on the subpoena.

1. Provide a list, in the form of a sortable Excel file, of all Field Technicians working in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, or Connecticut, who, at any time since September 1, 2016, requested a reasonable accommodation to a disability.  For each employee provide:

   a. Last name;
   b. First name;
   c. Sex;
   d. Address;
   e. Personal phone number;
   f. Position/job title at time of request;
   g. Work location;
   h. Date of request;
   i. Work restriction;
   j. Indicate whether an accommodation was provided; and
   k. If an accommodation was provided, describe the accommodation.

2. Provide a list, in the form of a sortable Excel file, of all Field Technicians working in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, or Connecticut, who, at any time since September 1, 2016, requested a reasonable accommodation to pregnancy, a condition related to pregnancy, and/or child birth.  For each employee provide:

   a. Last name;
   b. First name;
   c. Sex;
   d. Address;
   e. Personal phone number;
   f. Position/job title at time of request;
   g. Work location;
   h. Date of request;
   i. Work restriction;
   j. Indicate whether an accommodation was provided; and
   k. If an accommodation was provided, describe the accommodation.

3. Documents (including e-mails, memoranda, or notes made in any database or other electronic program used to manage and store information related to employee accommodation requests) concerning Respondent's receipt and evaluation of Charging Party's request for a lifting restriction and restriction on heights/climbing.

Area Office
Federal Building, Room 475
10 Causeway Street
Boston, MA 02203

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

Thomas M. Rutledge, CEO
Charter Communications
12405 Powerscourt Dr., Legal Dep't
St. Louis, MO 63131

or on the front if space permits.

1. Article Addressed to:

Thomas M. Rutledge, CEO
Charter Communications
12405 Powerscourt Dr.
ATTN: Legal Dept.
St. Louis, MO 63131

D. Is delivery address different from Item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)

PS Form 3811, August 2001         Domestic Return Receipt         102595-01-M-2509

# EXHIBIT K

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Thomas M. Rutledge, CEO
Charter Communications
12405 Powerscourt Dr.
ATTN: Legal Dep't.
St. Louis, MO 63131

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery

Robert McTegar

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

JAN 09 2020

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7012 3460 0002 0430 4662

PS Form 3811, August 2001       Domestic Return Receipt       102595-01-M

---

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

U.S EEOC
JFK Fed. Bldg.
Government Ctr., Room 475
Boston, MA   02203

# EXHIBIT L

# HUSCH BLACKWELL

Kayt Kopen
Attorney

190 Carondelet Plaza, Suite 600
St. Louis, MO  63105
Direct: 314.345.6304
Fax: 314.480.1505
kayt.kopen@huschblackwell.com

January 9, 2020

**VIA CERTIFIED MAIL & FACSIMILE**

Feng K. An
Office Director
U.S. Equal Employment Opportunity Commission
Boston Area Office
John F. Kennedy Federal Building
Government Center, Room 475
Boston, MA 02203
Fax: (617) 565-3196

> Re:   **Petition to Revoke Subpoena**
> *Samantha Fenderson v. Charter Communications, Inc.*
> Charge No. 523-2018-00971

Dear Director An,

Pursuant to 29 C.F.R. § 1601.16(b), Charter Communications, Inc. ("Charter") hereby files this petition to revoke Subpoena No. NY-A20-006, dated December 19, 2019 (the "Subpoena"). The Subpoena's broad requests for information regarding all Field Technicians *in a six-state geographic area*, who requested reasonable accommodations due to pregnancy and/or a disability, *over a three-and-a-half-year period*, seek irrelevant information, are overbroad, are unduly burdensome, are not proportional to the needs of the case, and are not properly limited in temporal or geographic scope. Furthermore, *Charter already provided a response* to the EEOC's request for documents regarding Charging Party's alleged request for lifting and/or climbing restrictions; thus, the Subpoena's continued request for this information is unreasonable. Therefore, Charter respectfully requests that you revoke the Subpoena in its entirety.

## I.   FACTUAL BACKGROUND

Charging Party began her employment with Charter on March 31, 2015 as a Field Technician in Portland, Maine. As a Field Technician, Charging Party was responsible for installing, setting up, troubleshooting, diagnosing, and repairing systems and equipment at customers' locations.

# HUSCH BLACKWELL

In or around September 2016, Charging Party informed her supervisor that she was pregnant. She did not state that her pregnancy was affecting her ability to perform her job or that she required time off from work. A few months later, Charging Party expressed some concern about engaging in strenuous activities due to her pregnancy. Charter *immediately* initiated the interactive process and requested information from Charging Party's medical provider regarding her ability to perform her essential job functions. At first, Charging Party communicated to Charter that her doctor was "refusing to take her off work." But eventually, Charging Party's doctor indicated that Charging Party required a leave of absence. Charter granted Charging Party a leave of absence as a reasonable accommodation for her pregnancy, from February 5, 2017 to July 3, 2017. Following the birth of her child, Charter granted Charging Party an additional leave of absence from July 4, 2017 to August 13, 2017.

Two months after returning to work, on October 18, 2017, Charging Party alleged to have strained her elbow and lower back. As a reasonable accommodation for this alleged injury, Charter granted Charging Party another leave of absence from October 19, 2017 to November 2, 2017.

Soon after Charging Party returned to work, in mid-November 2017, Charging Party's husband (who was also a Charter employee) mentioned to Human Resources for the first time that Charging Party needed time during the work day to express breast milk. *This was the first time Charter became aware of any need that Charging Party had for such an accommodation, as Charging Party never raised this issue previously.* As Charter was preparing to engage Charging Party in an interactive process to work out a schedule for expressing breast milk, Charging Party unfortunately suffered a miscarriage in mid-November. Charter granted Charging Party a leave of absence from November 22, 2017 until December 31, 2017 as a reasonable accommodation for her health condition during this time.

During this leave, on December 12, 2017, Charging Party's husband raised a concern to Human Resources that his wife had been subjected to certain unfavorable treatment. The very next day, Charter reached out to Charging Party to schedule an interview to discuss the concerns raised by her husband. Charter interviewed Charging Party via telephone. During that interview, Charging Party alleged: (1) her supervisor made negative comments about Charging Party's pregnancy and need to express breast milk, (2) her supervisor refused to change Charging Party's schedule to allow her to pick up her child from daycare, and (3) the HR Director was unable to assist when Charging Party contacted her regarding her morning sickness and need to express breast milk.

Charter thoroughly investigated Charging Party's allegations but ultimately was unable to substantiate her complaint. Indeed, Charging Party's supervisor shuffled the schedule to allow Charging Party to leave work early to pick up her child from daycare on 57% of her shifts, and allowed her husband to leave work early on the remainder of the shifts. Further, Charging Party never had a conversation with the HR Director or her supervisor about morning sickness or her need to express breast milk. The only conversation the HR Director had regarding Charging Party's pregnancy was when either Charging Party or her husband asked when Charging Party would be able to stop working due to her pregnancy; the HR Director responded that this date would be determined by medical advice and that Charter would need input from Charging

2

# HUSCH BLACKWELL

Party's medical provider. Charter informed Charging Party of its determination regarding her complaint and considered this matter resolved.

On January 2, 2018, Charging Party returned to work. Human Resources scheduled a meeting with Charging Party for the morning of January 3, 2018 to discuss her request for accommodations to express breast milk. Charter met with Charging Party to gather information regarding her request and Charter developed a proposed plan. Later that day, however, Charging Party alleged to have twisted her back outside of work. Charter granted her another leave of absence, beginning on January 3, 2018, to accommodate this alleged injury.

While Charging Party was on leave, Charter reached out to her to discuss its proposed accommodations for her expressing breast milk. Charter attempted to schedule a phone call with Charging Party on January 10, 2018 to discuss these accommodations, but Charging Party asked if the call could be rescheduled. After a few failed attempts to make contact with Charging Party, on January 17, 2018, Charter offered her its proposed accommodations via letter and email. First, Charter offered to reduce her job quota from 6 trouble calls per day to 5 trouble calls per day, which would offer her an estimated one-hour break in the day at around noon to express breast milk. Second, Charter offered to build in two 30-minute breaks—one at 10:00 a.m. and one at 2:00 p.m.—for Charging Party to express breast milk. Third, Charter offered to assign work to Charging Party in locations that were close enough to her home to allow her to go home to pump during these breaks. Fourth, Charter offered, once Charging Party moved into a new home she recently had purchased, to schedule her calls to allow her to take breaks at home at 10:00 a.m., 12:00 p.m., and 2:00 p.m. and also to reserve the nursing room at the Portland facility for Charging Party during these times.

Charter did not hear back from Charging Party regarding its proposed accommodations, so it sent follow-up correspondence to her on January 22, 2018. Charging Party never responded, however.

The next time Charter heard from Charging Party was on January 25, 2018, when Charging Party informed Charter that she was resigning. On January 29, 2018, Charter reached out to Charging Party to discuss her concerns, ask her to reconsider her resignation, and further discuss the accommodation process. Shortly thereafter, however, on February 2, 2018, Charging Party informed Charter that she still intended to resign. Charging Party voluntarily resigned from Charter on February 8, 2018.

## II.   PROCEDURAL BACKGROUND

During the course of the EEOC's nearly one-year investigation into Charging Party's Charge, Charter has cooperated and has already provided substantial amounts of information to the EEOC.

### A.   Initial Response to Charge

On August 5, 2019, Charter submitted a response to Charging Party's Charge, denying her discrimination, retaliation, and failure to accommodate claims. Charter explained: (1) it provided Charging Party with multiple accommodations related to her two pregnancies,

# HUSCH BLACKWELL

including two leaves of absence and a flexible work schedule; (2) Charging Party did not alert Charter to her alleged needs for the other accommodations mentioned in her Charge until around December 2017, while Charging Party was on her second pregnancy leave; and (3) after Charging Party requested these accommodations, Charter promptly engaged in an interactive process with her and ultimately granted her requests.

## B.   Detailed Statement of Position

The following week, on August 16, 2019, Charter submitted a more detailed Statement of Position, thoroughly describing Charging Party's accommodation requests, Charter's engagement in the interactive process, the accommodations offered to Charging Party, Charging Party's complaints, Charter's investigation into those complaints, and Charging Party's employment in general.

In that Statement of Position, Charter made clear that ***all of Charging Party's claims are time-barred***. Even assuming all of the allegedly discriminatory/retaliatory behavior was a continuous action, the latest date that Charging Party alleges the discrimination took place is February 18, 2018 (even though she resigned from Charter 10 days earlier). She did not file her Charge until February 1, 2019—***348 days later***. Accordingly, Charging Party is precluded from bringing these claims.

Further, Charter explained that Charging Party's claims alleged in the Charge fall within the scope of Charging Party's binding, mutual arbitration agreement with Charter, so any proceeding on the merits or for damages is subject to arbitration.

With its Statement of Position, Charter also submitted over 50 pages of documentation, including:

1.   Charging Party's mutual arbitration agreement with Charter;

2.   Charter's Equal Employment Opportunity Policy Statement;

3.   Charter's Code of Conduct;

4.   Charter's Accommodation of Disabilities Policy;

5.   Charging Party's husband's email to Charter raising an allegation that his wife was subjected to unfavorable treatment;

6.   Charging Party's husband's request that Charging Party transition to a new team closer to the new home they recently purchased;

7.   Charter's email to Charging Party detailing the allegations she raised during her telephone interview;

8.   Charter's correspondence offering Charging Party various accommodations for her need to express breast milk;

# HUSCH BLACKWELL

9.  Charter's follow-up correspondence to Charging Party regarding its proposed accommodations;

10. Charging Party's resignation letter; and

11. Charter's email correspondence with Charging Party encouraging her to reconsider her resignation and further discuss the accommodation process.

**C.      Response to First Request for Information**

That same day, on August 16, 2019, Charter also provided the EEOC with ***over 700 pages*** of information in response to its July 1, 2019 Request for Information, including:

1.  Charging Party's entire personnel file;

2.  Charging Party's entire medical file;

3.  Charter's 2017 Benefits Guide;

4.  Charter's Family and Medical Leave Policy (revised January 1, 2017);

5.  Charter's Family and Medical Leave Policy (revised March 15, 2018);

6.  Charter's Family and Medical Leave Policy (revised June 1, 2018);

7.  Charter's Family and Medical Leave Policy (revised February 1, 2019)

8.  Charter's Short-Term Disability Program;

9.  Charter's Conflicts Due to Nepotism or Personal Relationship Policy;

10. Charter's Employment of Relatives or Individuals with Close Personal Relationships Policy;

11. Charter's Reasonable Breaks for Nursing Mothers Policy;

12. Charter's Nursing Mother Guidelines;

13. Charter's Accommodation Request Form for Reasonable Break Period for Nursing Mothers;

14. Charter's Paid Parental Leave Policy;

15. Charter's Sick Leave Accrual Policy;

16. Charter's Personal Leave – Unpaid Non-Medical and Family Policy;

17. Charter's Employee Handbook;

18. Field Technician I Job Description;

## HUSCH BLACKWELL

19. Field Technician II Job Description;

20. Field Technician III Job Description;

21. Field Technician IV Job Description;

22. Field Technician V Job Description;

23. Field Technician VI Job Description;

24. Supervisor, Field Operations Job Description; and

25. Supervisor, Technical Service Job Description.

**D.     Response to Second Request for Information**

Less than four weeks later, on September 11, 2019, the EEOC served Charter with a second Request for Information. On September 26, 2019, in response to this request, Charter provided the EEOC with unredacted copies of the exhibits to Charter's August 16, 2019 Statement of Position.

**E.     Response to Third Request for Information**

The following month, on October 28, 2019, the EEOC served Charter with a third Request for Information. On November 15, 2019, in response to this request, Charter provided the EEOC with:

1. Charter's Reasonable Accommodations Policy;

2. Charter's Professional Appearance Policy; and

3. Charter's Professional Appearance Guidelines.

**F.     Response to Fourth Request for Information**

Less than a month later, on December 12, 2019, the EEOC served Charter with a fourth request for information. The next day, on December 13, 2019, in response to this request, Charter provided the EEOC with the link to Charter's third-party uniform vendor's website. The EEOC's request also asked for Charging Party's Sedgwick file, which Charter had already provided to the EEOC four months prior.

**III.     BASES TO REVOKE THE SUBPOENA**

Pursuant to 29 C.F.R. § 1601.16(b), Charter petitions the issuing Director to revoke the Subpoena based on the objections set forth below.

# HUSCH BLACKWELL

### A.      Paragraph Nos. 1 and 2

Paragraph Nos. 1 and 2 demand that Charter provide a list, in a sortable Excel file, of all Field Technicians working in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, or Connecticut who, at any time since September 1, 2016, requested a reasonable accommodation for a disability and/or for pregnancy. For each employee, these paragraphs demand that Charter provide: (a) last name, (b) first name, (c) sex, (d) address, (e) personal phone number, (f) position/job title, (g) work location, (h) date of request, (i) work restriction, (j) whether an accommodation was provided, and (k) a description of the accommodation provided.

These requests are overbroad, unduly burdensome, not proportional to the needs of the case, not properly limited in temporal scope, not properly limited in geographic scope; seek irrelevant information; and seek confidential information regarding individuals who are not parties to this Charge and who have not consented to the disclosure of this information.

The EEOC requested this same information in its July 1, 2019 Request for Information, in its September 11, 2019 Request for Information, and again in its October 28, 2019 Request for Information. Each time, Charter properly objected to these requests on the bases described above. Each time, the EEOC refused to reasonably narrow its requests.

> ### 1.      *The Commission's Demands Are Overbroad, Are Not Properly Limited in Temporal Scope, Are Not Properly Limited in Geographic Scope, and Seek Irrelevant Information.*

It is well-established that the EEOC's investigative authority is not plenary. Unlike the expansive investigatory powers provided to other federal agencies under various statutes, Title VII expressly limits the scope of an EEOC investigation to evidence that is "relevant to the charge under investigation." *E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 68 (1984) (quoting 42 U.S.C. § 2000e-8(a)). This limitation on the EEOC's power gives effect to Congress's "desire to prevent the [EEOC] from exercising unconstrained investigatory authority." *Shell Oil Co.*, 466 U.S. at 65. "The requirement of relevance . . . is designed to cabin the EEOC's authority and prevent 'fishing expeditions.'" *E.E.O.C. v. United Air Lines, Inc.*, 287 F.3d 643, 653 (7th Cir. 2002) (quoting *E.E.O.C. v. K-Mart Corp.*, 694 F.2d 1055, 1066 (6th Cir. 1982)).

Notably, the EEOC's own guidelines reflect its understanding that it should not seek evidence that exceeds the scope of the specific charge allegations. For example, the EEOC's *Compliance Manual* instructs investigators to collect evidence that is both "material to the complaint" and "relevant to the issue(s) raised in the complaint." EEOC Compliance Manual, *Development of Impartial and Appropriate Factual Records*, Ch. 6 § VII. Evidence is "material," the EEOC explains, "when it relates to one or more of the issues raised in the complaint." *Id.* Evidence is "relevant," the EEOC continues, "if it tends to prove or disprove a material issue raised by a complaint." *Id.*

In this case, the EEOC does not explain how the majority of information sought will assist it with resolving the question of whether Charter properly accommodated Charging Party's medical conditions during the year and a half when she was pregnant and/or expressing breast milk at Charter. First, the EEOC is demanding information during a three-and-a-half year period,

# HUSCH BLACKWELL

two years of which Charging Party was not even employed by Charter. Second, the EEOC is demanding information from a *six-state region*. During her entire employment with Charter, Charging Party worked only in Portland, Maine. The managerial and HR personnel involved in evaluating any accommodation requests of these other employees from irrelevant time frames and irrelevant geographic areas were not the same individuals involved in evaluating Charging Party's requests. Accordingly, Charter objects to the Subpoena's Paragraphs 1 and 2 on the bases that they are overbroad, are not properly limited in temporal or geographic scope, and seek irrelevant information. ***Charter also reiterates that Charging Party's claims are time-barred***.

2.     *The Commission's Demands Are Unduly Burdensome and Not Proportional to the Needs of the Case.*

It is well-settled that an EEOC subpoena should not be enforced if it is unduly burdensome. The EEOC's Subpoena in this case is unduly burdensome and vastly disproportionate to the needs of the case. The Subpoena seeks ***voluminous*** information relating to thousands of Charter employees. Retrieving and producing the information requested would cause significant cost to Charter both financially and administratively, and would disrupt Charter's normal business operations.

Charter employs nearly 100,000 employees. Charter does not have some centralized database documenting every accommodation request that every employee has ever made. In order to respond to the EEOC's Subpoena, Charter would need to pull the complete personnel *and* medical files of each and every Field Technician in a six-state region over a three-and-a-half-year period to determine whether they ever made an accommodation request. As the EEOC knows from the personnel and medical files of Charging Party that Charter produced in connection with this Charge, those files often contain several hundred pages of records. Charter also would need to ***interview*** all supervisors and HR personnel responsible for those thousands of employees to determine whether any verbal accommodation requests were made and to determine what accommodations ultimately were provided. Charter estimates this process would take nearly ***10 hours per employee***. The EEOC's request is egregiously unreasonable.

In addition, the Subpoena requires that Charter ***create*** electronic databases containing this information. Charter is under no obligation to create such evidence. Even if it were, reviewing and coding into electronic format the information gathered from the hard copy documents and witness interviews would only increase Charter's time and expense. Accordingly, Charter objects to the Subpoena's Paragraphs 1 and 2 as unduly burdensome and disproportionate to the needs of the case.

3.     *The Commission Seeks Sensitive, Confidential Information Regarding Potentially Thousands of Charter's Employees.*

The Subpoena also demands the names, addresses, telephone numbers, and sensitive medical information of a large number of Charter employees. Producing such information is inconsistent with Charter's obligation to protect the privacy of its employees and to take measures to avoid the threat of identity theft or violation of medical privacy laws. Charter objects to the Subpoena to the extent it requires Charter to produce such information.

## HUSCH BLACKWELL

**B.      Paragraph No. 3**

In Paragraph No. 3, the EEOC demands that Charter produce documents concerning Charter's "receipt and evaluation of Charging Party's request for a lifting restriction and restriction on heights/climbing." The EEOC already requested this information in its October 28, 2019 Request for Information. And ***Charter already provided an answer to this request in its November 15, 2019 response***. In that response, Charter explained that Charging Party did ***not*** request a lifting or height restriction, and Charter never evaluated or denied such a request. After Charging Party verbally expressed some concern about climbing ladders and carrying heavy equipment, Charter initiated the interactive process. What Charging Party requested as an accommodation was a ***leave of absence***. Charter granted Charging Party's request. Accordingly, there are no documents responsive to the EEOC's demand.

The face of the Subpoena makes clear that it is a prerequisite that an employer fail to comply with previous requests of the EEOC before the agency may serve the employer with a subpoena. The EEOC's own guidance further provides that "***[i]f an employer refuses to cooperate with an EEOC investigation***, [the] EEOC can issue an administrative subpoena to obtain documents, testimony or gain access to facilities." U.S. Equal Employment Opportunity Commission, *What you Can Expect After You File a Charge*, https://www.eeoc.gov/employees/process.cfm (emphasis added).

Charter did ***not*** fail to comply with the EEOC's previous request for the information demanded in Paragraph 3. To the contrary, Charter fully complied with this request by explaining that the documents requested simply do not exist.

## IV.   CONCLUSION

This Subpoena was issued in connection with a single charge of discrimination filed by a single employee in Portland, Maine. The EEOC has expanded its investigation of that Charge into an exhaustive audit of all of Charter's accommodation practices in a six-state region. Under these circumstances, the EEOC has not and cannot meet its burden of showing that the information sought in the Subpoena is "relevant to the charge under investigation" and, therefore, the Subpoena should be revoked.

For the foregoing reasons, Charter petitions the issuing Director to revoke the Subpoena in its entirety.

Sincerely,

Kaytlin E. Kopen
Attorney



U.S. Postal Service™  J. GORMAN
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$
Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $          Postmark
☐ Certified Mail Restricted Delivery  $          Here
☐ Adult Signature Required          $
☐ Adult Signature Restricted Delivery  $
Postage
$
Total Postage
$
Sent To
        Feng K. An
        Office Director
U.S. Equal Employment Opportunity Commission
Boston Area Office/John F. Kennedy Federal Building
        Government Center, Room 475
        Boston, MA 02203

PS Form 3800, April 2015 PSN 7530-02-000-9047        See Reverse for Instructions

7018 2290 0001 0325 2910



**SENDER:** *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

        Feng K. An
        Office Director
U.S. Equal Employment Opportunity Commission
Boston Area Office/John F. Kennedy Federal Building
        Government Center, Room 475
        Boston, MA 02203

9590 9402 4492 8248 9980 90

2. Article Number *(Transfer from service label)*

7018 2290 0001 0325 2910

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee
B. Received by *(Printed Name)*      C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053        Domestic Return Receipt

# EXHIBIT M

**BEFORE THE UNITED STATES
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

IN THE MATTER OF

| | | |
|---|---|---|
| **Samantha Fenderson,** | ) | |
| | ) | |
| **Charging Party** | ) | **Subpoena No.** |
| | ) | **NY-A20-006** |
| v. | ) | |
| | ) | **Charge No.** |
| | ) | **523-2018-00971** |
| **Charter Communications, Inc.,** | ) | |
| | ) | |
| **Respondent** | ) | |

PETITIONER
Charter Communications, Inc.
Thomas M. Rutledge, CEO
12405 Powerscourt Dr.
St. Louis, MO 68131

PETITIONER'S ATTORNEY
Kayt Kopen, Esq.
Husch Blackwell LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105

DETERMINATION ON PETITION TO REVOKE
SUBPOENA NO. NY-A20-006

Pursuant to the provisions of 29 C.F.R. § 1601.16 (1990) and § 24.12 of the EEOC

Compliance Manual (BNA), the Equal Employment Opportunity Commission (hereinafter

"EEOC" or "Commission") makes the following determination regarding the Petition to Revoke

Subpoena No. NY-A20-006 filed by Respondent Charter Communications, Inc. (hereinafter

"Charter").  It is our determination that Respondent's request for revocation of the Subpoena

shall be DENIED.

BACKGROUND

On April 2, 2018, Samantha Fenderson (hereinafter "Charging Party") submitted a

written complaint of discrimination against Respondent, alleging sex discrimination (pregnancy)

and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended (hereinafter

"Title VII").  On December 12, 2018, the EEOC provided notice of this charge to Respondent, and on February 1, 2019, Charging Party perfected her charge by signing and verifying a Charge of Discrimination with EEOC alleging sex discrimination (pregnancy) and retaliation in violation of Title VII.  Attach. A – Charge of Discrimination.  Charging Party, who was employed by Respondent as a Field Technician, alleges that she requested multiple accommodations to her job and uniform as a result of her pregnancy, including a uniform that fit correctly and modifications to her job duties.  Charging Party alleges that her manager was openly hostile to her pregnancy and that Respondent refused to provide the accommodations she requested.  Charging Party further alleges that Respondent failed to accommodate her need for breaks to express breast milk upon her return from maternity leave.  Charging Party alleges that "other similarly situated employees not in [her] protected class are subject to more favorable terms and conditions of employment."

Respondent denies that it discriminated against Charging Party.  Respondent asserts that, in response to Charging Party's request for a reasonable accommodation, it placed her on a leave of absence.  Respondent states that it offered Charging Party modifications to her schedule that would permit her to express breast milk, but that Charging Party never responded and, instead, resigned her position in February 2018.

Upon receipt of Charging Party's perfected Charge of Discrimination, EEOC served on Respondent a Notice of Charge and a copy of the Charge.  After receiving a Position Statement from Respondent, EEOC, on July 1, 2019, sent Respondent a request for information seeking all documents relating to Charging Party's requests for accommodation to her pregnancy (including her request for a new uniform, light duty, or other reasonable accommodation).  The Commission's July 1st request for information also sought a list of employees in New England

who, since September 1, 2016, had sought a reasonable accommodation for a disability, along

with information that would permit the Commission to contact these individuals and information

about the date of the request and whether the accommodation was provided.  The Commission

requested identical information for employees in New England who, since September 1, 2016,

had requested a reasonable accommodation for a condition related to pregnancy or childbirth.

Charter failed to respond to this request.

On August 9, 2019, after receiving no response to its July 1, 2019 request for

information, EEOC again asked Charter to respond and provided Charter with an extension, until

August 16, 2019, to produce the requested information.  On August 16, 2019, Charter responded

to EEOC's request for information.  In response to EEOC's request for documents relating to

Charging Party's request for an accommodation, Charter produced documents related to

communications between Charging Party and Sedgwick, Respondent's agent; communications

between Charging Party's doctor and Sedgwick; and communications from Sedgwick to Charter.

Respondent produced no documents relating to communications from Charter to Sedgwick, nor

did it provide any documents reflecting the company's consideration of Charging Party's

requests for pregnancy accommodations.  Respondent objected to EEOC's request for

information about other employees in New England who had sought accommodations for

disability and/or pregnancy as "overly broad; unduly burdensome; not properly limited in

temporal, geographic, or subject matter scope; not proportional to the needs of the case; not

relevant to Charging Party's claims; and seeking confidential medical information from

individuals who are not parties to this Charge and who have not consented to the disclosure of

such information."

On September 11, 2019, after reviewing the information that Respondent produced, EEOC gave Respondent a second opportunity to voluntarily provide information about other employees in New England who had sought accommodations for disability and/or pregnancy. On September 26, 2019, Respondent stated to EEOC that it maintained its objections to providing information about other individuals who had sought accommodations for disability and/or pregnancy.

On October 28, 2019, EEOC sent Respondent a request for information.  At this time, EEOC indicated that the documents previously produced by Respondent "indicate that Charging Party initially requested an accommodation to a lifting restriction and restriction on heights." EEOC asked Respondent to provide copies of all documents concerning Respondent's receipt and evaluation of that request and to identify the individual(s) employed by Respondent who decided to deny that request.  In response to Charter's complaint of overbreadth, EEOC narrowed its request for comparator information to all Field Technicians working in New England who, at any time since September 1, 2016, requested a reasonable accommodation to a disability, including information to assist the EEOC in contacting those individuals, a description of the work restriction(s) at issue, and information about what – if any – accommodation was provided.  EEOC also sought identical information for any New England Field Technician who, since September 1, 2016, sought an accommodation to pregnancy or a condition related to pregnancy and/or child birth.

On November 15, 2019, Respondent responded to EEOC's October 28th request. Respondent objected to providing any information about the narrowed category of New England Field Technicians who had sought reasonable accommodations because of disability, pregnancy, or conditions related to pregnancy and/or child birth.  Respondent objected on the grounds that

4

the requests were "overly broad, unduly burdensome, not properly limited in temporal or

geographic scope, not proportional to the needs of the case, not relevant to Charging Party's

claims in this matter, and seeking confidential medical information from individuals who are not

parties to this Charge and who have not consented to the disclosure of this information."

Respondent further objected to the request as "harassing."  Respondent denied that Charging

Party requested a lifting or height restriction, or that it denied such a request.

On December 12, 2019, EEOC sent Charter an email clarifying that its October 28th

request sought communications between Charter and Sedgwick as well as information about

uniforms available to Charter's employees through a third-party supplier.  On December 13,

2019, in response to EEOC's request for information about Respondent's consideration of

Charging Party's request for an accommodation to lifting and height requirements, Respondent

referred EEOC to "Charging Party's Sedgwick file."  Respondent also stated that its December

13, 2019 correspondence "will serve as Charter's final response to the Commission's request for

additional information."

On December 19, 2019, EEOC issued Subpoena No. NY-A20-006.  Attach. B –

Subpoena No. NY-A20-006.  The subpoena requested the following information:

1. Provide a list, in the form of a sortable Excel file, of all Field Technicians working in
   Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, or Connecticut,
   who, at any time since September 1, 2016, requested a reasonable accommodation to
   a disability.  For each employee provide:

   a. Last name;
   b. First name;
   c. Sex;
   d. Address;
   e. Personal phone number;
   f. Position/job title at time of request;
   g. Work location;
   h. Date of request;
   i. Work restriction;

5

      j.   Indicate whether an accommodation was provided; and

      k.  If an accommodation was provided, describe the accommodation.

2. Provide a list, in the form of a sortable Excel file, of all Field Technicians working in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, or Connecticut, who, at any time since September 1, 2016, requested a reasonable accommodation to pregnancy, a condition related to pregnancy, and/or child birth.  For each employee provide:

      a.  Last name;

      b.  First name;

      c.  Sex;

      d.  Address;

      e.  Personal phone number;

      f.   Position/job title at time of request;

      g.  Work location;

      h.  Date of request;

      i.   Work restriction;

      j.   Indicate whether an accommodation was provided; and

      k.  If an accommodation was provided, describe the accommodation.

3. Documents (including e-mails, memoranda, or notes made in any database or other electronic program used to manage and store information related to employee accommodation requests) concerning Respondent's receipt and evaluation of Charging Party's request for a lifting restriction and restriction on heights/climbing.

In response to EEOC's subpoena, Respondent timely mailed a Petition to Revoke the EEOC Subpoena on January 9, 2020.  Attach. C – Petition to Revoke Subpoena NY-A20-006. Respondent argues that the Subpoena should be revoked because it seeks information that is not relevant to the charge, is overbroad, unduly burdensome, not proportional to the needs of the case, not properly limited in temporal or geographic scope, and that the subpoena is unreasonable because Respondent already provided sufficient information about Charging Party's request for lifting/climbing restrictions (Request 3).

## ANALYSIS

"Title VII of the Civil Rights Act of 1964 permits the Equal Employment Opportunity Commission (EEOC) to issue a subpoena to obtain evidence from an employer that is relevant to

a pending investigation." *McLane Co. v. EEOC,* 137 S. Ct. 1159, 1164 (2017), *as revised* (Apr.

3, 2017). Relevance, in this context, is understood as allowing EEOC "access to virtually any

material that might cast light on the allegations against the employer." *EEOC v. Shell Oil Co.,*

466 U.S. 54, 68-69 (1984). EEOC's administrative subpoenas will be enforced where (1)

Congress has granted authority to investigate; (2) the procedural requirements have been met;

and (3) the evidence sought is relevant and material to the investigation. *EEOC v. McLane Co.,*

*Inc.,* 857 F.3d 813, 816-17 (9th Cir. 2017), *rev'd on other grounds.* Through Title VII,

"Congress intended [the EEOC] to have broad access to information relevant to the inquiries it is

mandated to conduct." *EEOC v. Ford Motor Credit Co.,* 26 F.3d 44, 47 (6th Cir. 1994).

### 1. The Information Requested is Relevant to the Investigation.

Respondent asks that Subpoena No. NY-A20-006 be revoked because, it asserts, the

material requested is not relevant to the Charge. Specifically, Respondent argues that the

requested information exceeds the scope of Charging Party's allegations. Petition at 7.

Respondent complains that the Subpoena is overbroad because it seeks information that is not

properly limited in temporal or geographic scope. Petition at 7. Respondent also complains that,

despite its objections to EEOC's requests for information, "the EEOC refused to reasonably

narrow its requests." *Id.*

Here, Charging Party alleges that she was subject to disparate treatment because of her

sex/pregnancy. Charging Party further alleges that she was treated less favorably than similarly

situated employees outside her protected class. Thus, Respondent's treatment of other Field

Technicians who have sought accommodations because of disability, pregnancy, pregnancy-

related conditions, or conditions related to child birth is plainly relevant. *McDonnell Douglas*

*Corp v. Green,* 411 U.S. 792, 804 (1973) (comparator evidence is especially relevant to disparate

treatment claim); *Mesnick v. General Electric Co.,* 950 F.2d 816, 824 (1st Cir. 1991) (evidence

of "differential treatment in the workplace" is common example of evidence properly used to

demonstrate discrimination); *EEOC v. Cambridge Tile Mfg. Co.,* 590 F.2d 205, 206 (6th Cir.

1979) ("The existence of patterns of racial discrimination in job classifications or hiring

situations other than those of the complainants may well justify an inference that the practices

complained of here were motivated by racial factors.") (*quoting Blue Bell Boots, Inc. v. EEOC,*

418 F.2d 355, 358 (6th Cir. 1969)).

In *Young v. United Parcel Service, Inc.,* 575 U.S. 206, 229 (2015), the Supreme Court

noted that "a plaintiff alleging that the denial of an accommodation constituted disparate

treatment … may make out a prima facie case by showing … that she belongs to the protected

class, that she sought accommodation, that the employer did not accommodate her, and that the

employer did accommodate others 'similar in their ability or inability to work.'" Evidence

demonstrating Respondent's treatment of non-pregnant workers who sought accommodations

because of restrictions on their ability to work is relevant to Charging Party's claim. *Young,* 575

U.S. at 229. Similarly, evidence that Respondent treated pregnant workers seeking

accommodations less favorably than non-pregnant workers seeking accommodations is also

relevant to Charging Party's claim. *Id.* ("by providing sufficient evidence that the employer's

policies impose a significant burden on pregnant workers," a plaintiff may show intentional

discrimination.); *see also EEOC v. VF Jeanswear LP,* 769 Fed. Appx. 477, 478 (9th Cir. 2019)

("EEOC subpoenas are enforceable so long as they seek information relevant to any of the

allegations in the charge, not just those directly affecting the charging party.").

Respondent's complaint that EEOC's request is not properly limited in temporal or

geographic scope is not supported. As an initial matter, we note that EEOC did narrow its

request for comparator information in response to Charter's objections.  EEOC first sought information relating to accommodation requests by all of Charter's employees in New England from September 1, 2016 through the present.  EEOC subsequently narrowed its request, seeking information relating to accommodation requests by New England Field Technicians, the same position held by Charging Party.[1]  The information sought in Subpoena NY-A20-006 is appropriate in temporal and geographic scope given the type of evidence the Supreme Court has described as relevant to a claim of pregnancy discrimination.

Charging Party may prove her allegations of disparate treatment by demonstrating that Respondent places a significant burden on pregnant workers.  *Young,* 575 U.S. at 229.  A "plaintiff can create a genuine issue of material fact as to whether a significant burden exists by providing evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers." *Id.* at 229-230. Subpoena NY-A20-006 seeks evidence appropriate to this inquiry.  The request for information is limited to individuals who perform job duties similar to those performed by Charging Party, i.e., Field Technicians.  The request is limited in geographic scope to New England, where Charging Party worked, and the request is limited in temporal scope to a time period beginning approximately six months prior to Charging Party's initial request for an accommodation through the present.  To undertake the analysis described by the Supreme Court in *Young,* it is necessary for the EEOC to look beyond Respondent's decision with respect to Charging Party's request for a reasonable accommodation.  Because Charging Party's allegation is one of disparate treatment,

---

[1] Charter complains that EEOC sought the same comparator information three times.  This is a misstatement of the record.  EEOC first sought comparator information on July 1, 2019.  On September 11, 2019, after Charter objected to producing such information, EEOC provided Charter with a second opportunity to voluntarily comply with its July 1st request.  On October 28, 2019, EEOC sent a new, more tailored request for comparator information, limiting the scope of individuals about whom it sought information to New England Field Technicians.  This is consistent with EEOC's practice of attempting voluntary compliance before resorting to issuing a subpoena.

it is reasonable to compare Respondent's treatment of Charging Party to its treatment of other similarly situated workers, both pregnant and not pregnant. *See Young,* 575 U.S. at 231 (finder of fact will consider "why, when the employer accommodated so many, could it not accommodate pregnant women as well?").

Moreover, where, as here, an employer relies on nationwide policies and uniform procedures to support its decision, relevant information is not limited to the specific location where Charging Party was employed. *See, e.g., EEOC v. United Parcel Service, Inc.,* 587 F.3d 136, 139-40 (2d Cir. 2009) (accommodation and hiring decisions made at company's facilities nationwide relevant to charges alleging religious discrimination at individual facility); *EEOC v. Univ. of Pittsburgh,* 643 F.2d 983, 985-86 (3d Cir. 1987) (lists and information concerning all instructors and teaching positions in four professional schools relevant to charge of sex discrimination in compensation in school of nursing), *cert. denied,* 454 U.S. 880 (1981).

For these reasons, we reject Respondent's argument that Subpoena No. NY-A20-006 seeks irrelevant information, is overbroad, and not properly limited in temporal or geographic scope.

## 2. The Subpoena is not Unduly Burdensome.

Respondent complains that it would be unduly burdensome to comply with Subpoena No. NY-A20-0006. Petition at 8.[2] The producing party bears the burden of demonstrating that compliance with the subpoena would be unduly burdensome. *EEOC v. Children's Hosp. Med. Ctr. Of N. Cal.,* 719 F.2d 1426, 1428 (9th Cir. 1983). Respondent carries a "difficult burden" in establishing that compliance with the subpoena would impose an undue burden. *EEOC v. United*

---

[2]    Respondent also argues that the subpoena is "not proportional to the needs of the case." Respondent cites no case law in support of its contention that proportionality is relevant to the analysis of the enforceability of an administrative subpoena issued under Title VII. As such, we will not address this argument.

*Air Lines, Inc.,* 287 F.3d 643, 653 (7th Cir. 2002).  To meet this difficult standard, Respondent

must show that the cost of compliance with the subpoena is "unduly burdensome in the light of

the company's normal operating costs." *EEOC v. Md. Cup Corp.,* 785 F.2d 471, 479 (4th Cir.

1986); *see United Airlines,* 287 F.3d 643 at 653 ("Often we have phrased this 'difficult burden'

as requiring a showing that 'compliance would threaten the normal operation of a respondent's

business."), *quoting EEOC v. Bay Shipbuilding Corp.,* 668 F.2d 304, 313 (7th Cir. 1981).

Respondent's undue burden claims fall far short of meeting this difficult standard.  Here,

Charter, which employs nearly 100,000 employees, asserts that the information requested by

EEOC is not kept in a "centralized database," and that responding to the subpoena would require

the review the personnel and medical files of every Field Technician in a six-state area over a

three-and-a-half year period and interview Human Resources and managerial personnel.  Petition

at 8.  Charter indicates that this process would take approximately ten hours per employee.  *Id.*

Charter provides no evidence to support its estimate, nor does it provide any evidence of the cost

of compliance within the context of the company's normal operating costs.  This, alone, is a

basis for rejecting Respondent's argument that compliance with the subpoena constitutes an

undue burden.  *EEOC v. Aaron Bros., Inc.,* 620 F. Supp. 2d 1102, 1108 (C.D. Cal. 2009)

(respondent failed to meet its burden of showing that subpoena is overbroad and unduly

burdensome where it failed to produce evidence of the size of its operations and capacity to

handle costs of compliance).

Additionally, based on the records Charter has produced thus far in the investigation, it

appears that Charter does keep – or has access to – employee records kept in an electronic format

that track employee requests for accommodation and indicate whether pregnancy – or some other

11

condition – is the cause of the disability of the requesting employee.[3]  It is reasonable to assume

that Charter could use this database – as opposed to a more time-consuming review of individual

employee personnel files – to identify Field Technicians in New England who have sought

accommodations for disability, pregnancy, and/or complications related to pregnancy or child

birth.  Thus, Respondent's estimate that a review of its personnel records to locate responsive

information would require "10 hours per employee," is an overstatement, as it ignores

Respondent's access to searchable, electronic records.  Even if EEOC is incorrect about

Charter's ability to locate responsive information in an electronic database, Charter's argument

remains unpersuasive.  "The manual review of personnel files does not rise to the level of an

undue burden." *EEOC v. Alliance Residential Co.,* 866 F. Supp. 2d 636 (W.D. Tex. 2011).

That the task of reviewing these records and responding to EEOC's subpoena would

require time and would have some cost is not, by itself, a basis for revoking the subpoena. *See*

*id.*  The cost of compliance should be considered within the context of Respondent's size. *See*

*VF Jeanswear,* 769 Fed. Appx. At 478 (where company employed approximately 2,500

employees, cost of over $10,000 to comply with subpoena was not unduly burdensome); *EEOC*

*v. Maryland Cup Corp.,* 785 F.2d 471, 479 (4th Cir. 1986) (employer had not established that

compliance with EEOC subpoena would be unduly burdensome where compliance would cost an

estimated $75,000 and require interviewing supervisors and former coworkers of former

employees).

Charter argues that compliance with Subpoena No. NY-A20-006 would constitute an

undue burden because compliance with the subpoena would require it to "create electronic

---

[3]      Charter produced multiple documents entitled "Disability Report" with respect to Charging Party.  These reports, which appear to be printouts of an electronic record maintained in a database, contain the employee's name, address, phone number, employee ID, gender, job title, and disability information.  Attachment D – Disability Report for Samantha Fenderson.

databases containing" the requested information so that it could produce the requested

information in an electronic format. Petition at 8. Charter's argument (which it makes without

citation to any legal authority) is misplaced. EEOC's subpoena power is "not limited to the

production of documents already in existence. Rather, the enabling statute grants the EEOC

broad authority to require the production of *any* evidence." *Maryland Cup,* 785 F.2d at 479

(although the information sought by subpoena may only have existed in the minds of the

company's employees, the company was required to produce the information) (internal

quotations omitted) (emphasis in original); *see EEOC v. Citicorp Diners Club, Inc.,* 985 F.2d

1036, 1039 (10th Cir. 1993) ("EEOC may compel an employer to compile information within its

control in order to respond to a subpoena"); *NLRB v. Champagne Drywall, Inc.,* 502 F. Supp. 2d

179, 181 (D. Mass. 2007) (where information sought, in its "raw data form" existed and was

within respondent's control, court required respondent to "compile the data into the format as

requested by the subpoenas.").

Finally, "There is a presumption in favor of requiring an employer's compliance with a

subpoena when the Commission inquires into legitimate matters of public interest." *EEOC v.

Konica Minolta Business Solutions U.S.A., Inc.,* 639 F.3d 366, 371 (7th Cir. 2011). Pregnancy

discrimination continues to be a matter of public concern, as recent news reports confirm.

Respondent has failed to establish that complying with Subpoena No. NY-A18-012 would cause

Respondent an undue burden. As such, this objection is insufficient grounds for revoking the

Subpoena No. NY-A20-006.

### 3. Personal Employee Information is Not Immune from Subpoena.

Charter argues that Subpoena No. NY-A20-006 should be revoked because compliance

would require it to provide EEOC with the names, addresses, telephone numbers, and sensitive

medical information of a large number of Charter employees and that "[p]roducing such information is inconsistent with Charter's obligation to protect the privacy of its employees and to take measures to avoid the threat of identity theft or violation of medical privacy laws." Petition at 8.  Again, Charter fails to cite any legal or statutory authority in support of its argument.

Confidentiality is not a bar to enforcement of an administrative subpoena. *See EEOC v. Assoc. Dry Goods Corp.,* 449 U.S. 590, 604 (1981) (holding employer did not have "a categorical right to refuse to comply with EEOC subpoena unless the Commission assured that the information would be held in absolute secrecy"); *EEOC v. Bay Shipbuilding Corp.,* 668 F.2d 304, 312 (7th Cir. 1981) ("confidentiality is no excuse for noncompliance"); *EEOC v. Univ. of N.M.,* 504 F.2d 1296, 1303 (10th Cir. 1974) (requiring compliance of personnel information even though such records were "both confidential and extremely sensitive").  Moreover, Title VII explicitly prohibits EEOC from making public charges of discrimination or any information obtained pursuant to EEOC's investigatory powers. 42 U.S.C. § 2000e-5(b), § 2000e-8(e).  As such, Respondent's concerns about the confidential nature of the information sought by the subpoena is not a basis for revoking Subpoena No. NY-A20-006.

### 4.  Respondent Has Not Substantially Complied with Request Number 3.

Respondent asserts that Request Number 3 should be revoked, in part, because it has already provided an answer to this request. Petition at 9.  According to Respondent, "Charging Party did not request a lifting or height restriction, and Charter never evaluated or denied such a request." *Id.*  Charter maintains that "[w]hat Charging Party requested as an accommodation was a leave of absence.  Charter granted Charging Party's request.  Accordingly, there are no documents responsive to EEOC's demand." *Id.*

14

Respondent's position, however, is contradicted by documents that it has produced to date in the investigation. Specifically, Respondent has produced a document entitled "ADA – Physician Certification," which Charging Party's doctor submitted on February 20, 2017, in which Charging Party's doctor indicates that the Charging Party is "[t]emporarily impaired and … requires an accommodation to the function in his or her job," in the form of a lifting restriction and a height restriction. Attach E – Dr. Le Franc Fax, Feb. 20, 2017. Respondent has produced multiple other documents from Charging Party's Sedgwick file that indicate that Charging Party sought a return to work with restrictions and limitations on her ability to work in the form of lifting and height restrictions, including a request from Sedgwick to Charter, on February 22, 2017, to approve such an accommodation. Attach F – Feb. 22, 2017 Email from Sedgwick to Charter.

What Respondent has failed to provide, however, are any documents relating to Respondent's apparent decision to deny the requested accommodation and, instead, place Charging Party on a leave of absence, nor has it denied that such documents exist. As such, Respondent has not provided sufficient information in response to Request 3, and this argument is not grounds for revoking Subpoena No. NY-A20-006.

## 5. Respondent's Arguments Regarding the Merits or Timeliness of the Charge are Incorrect.

Finally, we address Respondent's argument that Subpoena No. NY-A20-006 should be revoked because of Respondent's position that Charging Party's claim is subject to arbitration and is untimely. Petition at 4. EEOC is not required to establish the merits of the underlying charge in order to subpoena information relevant to EEOC's investigation of that charge. *See EEOC v. Randstad,* 685 F.3d 433, 442 (4th Cir. 2012) ("The process of reviewing an administrative subpoena for judicial enforcement is not one for a determination of the underlying

15

claim on its merits") (internal citation omitted); *see also EEOC v. Dillon Cos., Inc.,* 310 F.3d 1271, 1277 (10th Cir. 2002) ("We will not ... either encourage or allow an employer to turn a summary subpoena-enforcement proceeding into a mini-trial by allowing it to interpose defenses that are more properly addressed at trial."). The Commission's authority to investigate "is not negated simply because the party under investigation may have a valid defense to a later suit." *EEOC v. United Air Lines, Inc.,* 287 F.3d 643, 651 (7th Cir. 2002), *citing EEOC v. Tempel Steel Co.,* 814 F.2d 482, 486 (7th Cir. 1989). Moreover, the fact that an employee and her employer may have entered into an agreement to arbitrate certain claims does not divest EEOC of its authority to investigate a charge of discrimination filed by that employee. *See EEOC v. Waffle House, Inc.,* 534 U.S. 279, 288 (2002) (noting EEOC's "independent statutory responsibility to investigate and conciliate claims"). As such, the availability of potential defenses to a claim by Charging Party do not constitute appropriate grounds for revoking the subpoena at issue here.

Furthermore, the charge at issue was timely filed with EEOC. On April 2, 2018, Charging Party sent a letter to EEOC that stated, "This document is my complaint against Charter Communications." The April 2nd letter, submitted well within the 300-day statute of limitations, contained Charging Party's name, the name of her employer, and a detailed description of the alleged discrimination, including Charging Party's prior attempts to work with her employer to resolve the matter. Under the circumstances, the Commission reasonably construed Charging Party's April 2, 2018 letter "as a request for the [Commission] to take remedial action to protect [her] rights or otherwise settle a dispute between the employer and the employee." *Fed. Exp. Corp. v. Holowecki,* 552 U.S. 389, 402 (2008). On December 12, 2018, prior to the expiration of the 300-day statute of limitations, EEOC issued Respondent a notice of charge identifying Charging Party as the complainant. On February 1, 2019, Charging Party

perfected her charge by signing and verifying her allegations, and EEOC served the perfected

charge (which attached Charging Party's April 2, 2018 letter) on Respondent.

The Commission's regulations permit amendment of a timely-filed charge to "cure

technical defects or omissions," such as signature and verifications. *See* 29 C.F.R. § 1601.12.

The Supreme Court had held that this regulation, which permits an individual to file a timely

charge and verify it "after the time for filing has expired," is lawful and consistent with both the

language and purpose of Title VII. *See Edelman v. Lynchburg College,* 535 U.S. 106, 109

(2002). The allegations in Charging Party's perfected February 1, 2019 charge relate back to her

timely-filed April 2, 2018 complaint. *Id.* at 115 ("Construing § 706 to permit the relation back of

an oath omitted from an original filing ensures that the lay complainant, who may not know

enough to verify on filing, will not risk forfeiting his rights inadvertently."). As such,

Respondent's argument regarding timeliness is without merit and does not justify revocation of

Subpoena No. NY A20-006.

<u>CONCLUSION & DETERMINATION</u>

For the reasons stated above, Respondent's Petition to Revoke Subpoena No. NY-A20-

006 is denied. Respondent should produce all existing information described in the Subpoena

within 10 days of receipt of this Determination. Respondent is directed to mail the evidence to

Feng An, Boston Area Office Director, JFK Federal Building, Room 475, Government Center,

Boston, MA 02203.

ON BEHALF OF THE COMMISSION:

DATE: _February 6_ ,2020          *Bernadette B. Wil*

Bernadette B. Wilson
Executive Officer
Executive Secretariat

17